**W. Darnelle MIZE, Plaintiff,**

v.

**The HARFORD INSURANCE COMPANY, Defendant.**

Civ. A. No. 82–0064–D.

United States District Court, W.D. Virginia.

Dec. 2, 1982.

Charles M. Aaron, Martinsville, Va., for plaintiff.

W. Charles Waddell, III, S.D. Roberts Moore, Roanoke, Va., for defendant.

## MEMORANDUM OPINION

KISER, District Judge.

This is a suit by the Plaintiff, Darnelle Mize ("Mize") against the Defendant, The Harford Mutual Insurance Company ("Company" or "Insurance Company") arising out of a policy of homeowner's insurance issued by the Defendant covering a house owned by Mize which was damaged by fire on August 30, 1981. The suit is in this Court on the basis of diversity of citizenship. Both parties waived trial by jury, and it was tried by the Court without a jury on October 5, 1982, and is now before the Court for decision as to both the facts and the law.

It is undisputed that at the time of the fire on August 30, 1981, the Plaintiff had in effect with the Defendant a homeowner's policy covering the Plaintiff's house, that a fire occurred, and that as a result of the fire, Plaintiff sustained damages in the amount of $49,955.64. It is further undisputed that there was a mortgage lien in the amount of $30,000.00 against the house and that the insurance policy named the Farmer's Home Administration as a beneficiary to the extent of its lien. It was also stipulated by both sides that the fire was of an incendiary nature; that the arsonist was one Steve Wilson; and that the Plaintiff fully complied with the terms of the policy.

Plaintiff claims both compensatory and punitive damages alleging that she is entitled to her compensatory damages under the terms of the policy, and that she is entitled to punitive damages because of the Defendant's willful and malicious act in refusing to pay the claim. The Defendant defends the policy claim on two grounds: (1) that the Plaintiff had complicity in the arson; and (2) that the Plaintiff made certain material misrepresentations during the investigation of the claim. Defendant further denies that Plaintiff is entitled to punitive damages even if it is found to be liable upon the policy.

It is conceded by the Defendant that its defenses to payment of the claim under the policy are affirmative defenses on which it must bear the burden of proof. The Plaintiff contends that the burden which must be borne by the Defendant is to prove the defenses by "clear and convincing evidence". The Defendant, on the other hand, maintains that its burden is only to prove its defenses by a "preponderance of the evidence". Since this is a diversity case I must be guided by the law of the State of Virginia as to which standard of proof the Defendant will be held. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), *Fed.R.Evid.* 302.

The Plaintiff primarily relies on the case of *Virginia Fire & Marine Insurance Co. v. Hogue,* 105 Va. 355, 54 S.E. 8 (1906), as enunciating the burden which the Defendant must carry. *Virginia Fire* involved a suit on a fire insurance policy where the insurance company defended on the ground that the plaintiff had made fraudulent statements during the investigative period subsequent to the fire. The Virginia Supreme Court stated that in proving their defense the insurance company would be held to a "clear and convincing" standard of proof. This obviously would be applicable here to the Defendant's second defense of material misstatements made after the fire,

but the Defendant would distinguish this case with regard to the arson defense asserting that *Virginia Fire* applies only to fraudulent misstatements. In my opinion, the rationale of *Virginia Fire* does not admit of such a distinction. The whole thrust of the *Virginia Fire* rationale is that where the defense is one of a criminal act by the insured, the presumption that most people are law-abiding citizens requires that such an assertion be proven by clear and convincing evidence. Arson is one of the defenses which would come within that classification.

The Defendant relies primarily on the case of *Kimball Ice Co. v. Hartford Fire Insurance Co.*, 18 F.2d 563 (4 C.A.1927), as authority for the proposition that its burden is only that of a preponderance, but the case does not support that proposition. The plaintiff in that case tendered to the trial court and the trial court gave an instruction which stated that the defendant's burden was to prove its defenses by a preponderance of the evidence. Thus, there was never any issue before the court as to which was the appropriate standard. The court simply gave the requested instruction and if it was wrong, it was the plaintiff's own fault and he had no ground to complain.

In sum, I find that the burden of proof which the Defendant must carry is to prove its affirmative defenses by "clear and convincing evidence", and that is the standard I have applied to the evidence.

## I. CONTRACT CLAIM—COMPENSATORY DAMAGES

Plaintiff, two or three days prior to the fire on August 30, 1981, went to Myrtle Beach for a short vacation. It was her custom to take this type of vacation several times a year. Before leaving, she put her pets, which consists of two Doberman dogs and two Siamese cats, in a kennel. This was a change from her normal procedure of leaving them at home because prior to this time, her father and mother had been able to take care of them. However, her father had died the preceding December, and her mother could not take care of the pets

because she lived some distance from the Plaintiff and had no transportation. (Plaintiff's car had broken down, and she had borrowed her mother's.) When she left, she locked the upstairs portion of the house, but she was unsure about locking the basement. In any event, the basement had a "pet door" in it which would not lock and was large enough to permit the entry of a person. While she was at the beach, she learned of the fire from a phone call from the Henry County Sheriff's Department and came back home on the same day she received the call. Upon returning home, she contacted Deputy Sheriff Stoneman, who accompanied her to her house. Deputy Stoneman was the person who called the Plaintiff and informed her of the fire. He testified that upon learning of the fire, the Plaintiff was upset and crying. He further testified that the Plaintiff had requested him to keep an eye on the house during his routine patrols.

The Insurance Company, through an independent adjuster, conducted an investigation of the facts and circumstances surrounding the fire. During that investigation, the Plaintiff gave a statement to the adjuster who wrote it down in narrative form, and the Plaintiff signed it as her statement. Not being satisfied with that, the Insurance Company then required the Plaintiff to appear before its attorney and submit to interrogation under oath before a stenographer. Not being satisfied with that, the Insurance Company then told the Plaintiff, both orally through its retained adjuster and by letter which emanated directly from the Insurance Company's claims manager, that unless she submitted to a polygraph test and passed it, the company would not pay the claim. The polygraph test was to have been administered by the Virginia State Police polygraph operator. The Plaintiff refused this request and in keeping with its prior statements, the Insurance Company denied the claim. (Ed. note—Defendant never formally denied claim.)

At trial, the Insurance Company maintained the position that it did not really

deny the claim because of the Plaintiff's refusal to take the polygraph test, but that it denied the claim because of underlying suspicious circumstances. This rather amazing position is maintained by the Insurance Company in the face of the Plaintiff's testimony and in the face of the Company's own letter which point blank sets forth that the claim would be denied unless the insured took and passed a polygraph test. It appears to me that the Company's position during the trial is an afterthought to shore up its position, and I cannot accept it as the reason for denial. However, since the circumstances the Company deemed to be suspicious are interrelated with the material misrepresentation defense, they bear some examination.

In the testimony of the two company officials, Messrs. Miller and Foley, the Insurance Company ticked off eight facts, the combination of which the Company urges amounts to sufficient circumstantial proof that Plaintiff had complicity in the arson.

First is the circumstance that Plaintiff had been living with Steve Wilson (the arsonist) up until March of 1981. At no time did the Plaintiff attempt to hide this. She readily disclosed that she and Steve Wilson had been living together and that in March of 1981, he walked out on her. The record does not disclose why he walked out nor what the feelings of the parties were at the time of the breach. Plaintiff did testify, however, that because of their relationship, Wilson's wife instituted a divorce proceeding against him and that she (the Plaintiff) was called to testify in the proceedings. She further stated that after the breakup, she had casual meetings with Wilson on two or three occasions. The Insurance Company impeached this statement to some extent by showing that the Plaintiff had been seen in a car with Wilson at times other than she testified to. She flatly denied that she had anything to do with Wilson setting the fire.

The second circumstance was that the Plaintiff was absent at the time of the fire and had taken all of her jewelry with her. Plaintiff explained that she had gone on a short vacation and that she didn't have much jewelry, that what she had was of no great value and that she routinely took it with her when she traveled.

The third circumstance was that she had pets which she had historically left at the house when she was absent, but on the occasion of the fire, she had placed the pets in a kennel. She explained that in the past her parents had been able to look after the pets, but because of transportation problems her mother was unable to do that on this occasion and she had no choice but to board the pets at a kennel.

The fourth circumstance was that the Plaintiff stood to gain financially from the fire, that she was in financial difficulty with the bank as to her car payments and with the F.H.A. as to her house payment and that she had misrepresented her financial condition. As to her financial condition, the Plaintiff explained that it was in no worse shape than it had been for a number of years, and the officials of both the bank and the F.H.A. bore that out. She had a history of getting behind on her payments and then later catching them up. The main misstatement that the Defendant relies on as to the financial condition is her statement that her house payments were current. This was a matter of some confusion. The evidence showed that the Plaintiff wrote a check for $1,874.00 on August 26, 1981, which would have brought her payments current with the F.H.A. Her bank statement further shows that on the date she wrote the check she had sufficient money to cover it. However, for reasons known only to the F.H.A., the check was not deposited until some thirty (30) days later at which time it was returned for insufficient funds. On October 15, the F.H.A. notified the Plaintiff that the check had bounced and at that point in time, she told the F.H.A. she would make it good upon collection of the fire insurance proceeds, and this apparently satisfied the F.H.A.

The fifth circumstance was that the Plaintiff misstated the whereabouts of keys to the house. Plaintiff kept a key over a light on the front porch, and after the fire

she failed to tell the adjuster this fact. However, she had already been interviewed by the Fire Marshal and had disclosed that fact to him. She testified that Steve Wilson had had a key to the house while he was living with her and had taken the key with him when he left. Although she did not tell the Insurance Company about the keys, there is no indication in either of the statements that she was ever asked about keys to the house. It is the type of detail that a person untrained in criminal investigations could easily overlook.

The sixth circumstance was that she had no important papers in the house. Plaintiff explained that any documents or papers that she felt were important were always kept at her mother's house, and that she had not removed any papers from her house.

The seventh circumstance was that she had put the house up for sale by a realtor and had taken it off the market shortly before the fire. Again, the Plaintiff explained that she had in fact listed her house with a realtor, but that the realtor was having no success. She then took the house out of the hands of the realtor and contracted with an auctioneer to sell the house at auction. The auction had been scheduled for the weekend following the fire.

The eighth and last circumstance relied on by the Insurance Company was that the adjuster ascertained that the Plaintiff had a bad reputation for truth and veracity. This circumstance was testified to by the witnesses only after some prompting by counsel. It strikes me as totally a make-weight argument.[1]

The Insurance Company's view of the circumstances, whether viewed singularly or as a whole, is not impressive. Every circumstance listed by the Company was a perfectly normal, everyday act and was fully explained by the Plaintiff as such.[2] The

most cogent circumstance listed by the Defendant was Plaintiff's prior relationship with Steve Wilson, but as the record stands, this relationship was terminated some six months before the fire, and was never resumed. As stated previously, the only evidence before the Court of any resumption of the relationship is several contacts between the Plaintiff and Steve Wilson and some of those contacts, at least, were pertaining to Wilson's divorce suit and the Plaintiff's testimony therein.

Of great importance is the testimony of Mr. March, the adjuster whom the Defendant had hired to investigate the claim. It was through him (together with the statement that the Plaintiff made to the attorney) that the information was developed and the claim was managed. Mr. March knew that the Plaintiff vehemently denied any connection whatsoever with the arson, and he had no direct circumstances to the contrary. He testified, however, that when arson is involved, the owner of the property is always a suspect. He further testified he was suspicious of the Defendant because of the circumstances outlined above. He had done a full investigation in developing these circumstances and had been kept abreast of the police investigation. On several occasions, he requested that the Plaintiff submit to a police polygraph examination, and each time the Plaintiff very firmly refused. When March was advised by the police that their investigation was at an end and that no criminal prosecution would be pursued, he recommended to the Company that the Plaintiff's claim be paid. The Company chose not to follow this recommendation. There was never an indication in any of March's reports or in his testimony that there were any additional leads which could be pursued, clues which could be developed or sources of information which might be tapped if the Company had available to it compulsory process. In short, insofar as his

---

1. I would simply say that if the insured's reputation for truth and veracity is important to the Insurance Company, this fact should be ascertained before the insurance policy is written. Obviously, Plaintiff's reputation was not established in the short time she was insured by the Defendant.

2. When circumstances admit of two equally plausible interpretations, they are insufficient to carry the burden of proof. *Pennsylvania Railroad Co. v. Chamberlain, Administratrix*, 288 U.S. 333, 339, 53 S.Ct. 391, 393, 77 L.Ed. 819 (1933); *Pearcey v. St. Paul Fire & Marine Ins. Co.*, 163 Va. 928, 177 S.E. 843 (1935).

evaluation of the claim was concerned, the investigation was at an end when he filed his report with the Company on February 10, 1982, stating "we would be well advised to complete the settlement of this claim and be done with it."

■ Instead of following March's recommendation and without so much as checking with an attorney, the Insurance Company issued an ultimatum to the Plaintiff to submit to a polygraph test administered by the State Police or it would not pay the claim. The Insurance Company had no right under the policy or under the general law to issue such an ultimatum.[3] It simply chose to use the raw economic power at its disposal in a very heavy-handed manner.

■ Thus, I find that the Defendant has failed to sustain the two defenses it asserted, and accordingly find that the Plaintiff should recover the amount of stipulated damages, to-wit, $49,955.64 plus interest at the rate of 10% per annum from the 10th day of February, 1982.

## II. TORT CLAIM—PUNITIVE DAMAGES

■ I turn next to the issue of punitive damages. Punitive damages are allowed in a breach of contract action only when the breach is so egregious as to constitute a separate actionable tort. *See Wright v. Everett,* 197 Va. 608, 90 S.E.2d 855 (1956), *Matney v. First Protection Life Ins. Co.,* 73 F.R.D. 696 (W.D.Va.1977). Then the award of punitive damages is governed by the same standard as are punitive damages in any tort case. *F.B.C. Stores, Inc. v. Duncan,* 214 Va. 246, 198 S.E.2d 595 (1973); *Giant of Virginia v. Pigg,* 207 Va. 679, 152 S.E.2d 271 (1967).

■ In weighing the evidence, I find that the action of the Defendant was a willful

disregard of the Plaintiff's rights under the policy of the insurance. The Defendant imposed an unlawful condition and steadfastly refused to honor its obligation under the contract when it knew, or reasonably should have known, that it had no valid defense to the Plaintiff's claim and that withholding payment of the claim was imposing a hardship on the Plaintiff.

At some point in time, an insurance company must make a determination as to whether it has a legal defense to a claim. I find that the Company made this decision at or about the time it received Mr. March's report of February 10, 1982, and the decision was that the Company could not successfully defend the claim in a court of law and that is the very reason that it insisted upon the polygraph test in the hope that through that mechanism it would uncover additional facts that could be used in a court of law. It knew that the results of a polygraph test could not be used against the Plaintiff. *Lee v. Commonwealth,* 200 Va. 233, 105 S.E.2d 152 (1958); *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923); Salzburg & Reddin, *Federal Rules of Evidence Manual,* pp. 414 & 426; *Memphis Bank & Trust Co. v. Tenn. Farmers Mut. Ins. Co.,* 619 S.W.2d 395 (Tenn.App.1981); but *cf., Moskos v. National Ben Franklin Ins. Co.,* 60 Ill.App.3d 130, 17 Ill.Dec. 389, 376 N.E.2d 388 (1978). Therefore, the real purpose had to be a fishing expedition for additional usable facts to prove its suspicion that the Plaintiff had some complicity in the arson.

Defendant argues that it was justified in this position because of the suspicious circumstances which existed and because it did not have available to it the compulsory process of a court of law to further develop or investigate the suspicious circumstances. This position would be more appealing had the Defendant pointed to some specific area

---

**3.** Under the policy issued by Harford to Mize, Harford had the right to require Mize to "submit to examinations under oath by any person named by this Company, and subscribe to the same..." In *Walker v. Tennessee Farmers Mut. Ins. Co.,* 568 S.W.2d 103 (Tenn.App.1977), the Court held that language substantially the same as that in the present case was not broad enough to require the policyholder to submit to a polygraph examination. Agreeing with the

*Walker* case, I hold that the language in the policy at issue may not be read to require Mize to submit to a polygraph examination.

While the Court does not reach the issue, Harford's demand that Mize submit to a polygraph to be administered by the State Police as a part of an ongoing arson investigation raises serious Fifth Amendment questions. However, those questions will be left to another case.

in which it was hampered during the investigation and which, if further developed, could have lead to the connection of the Plaintiff to the arson. In an effort to point out such facts, the Defendant asserts it did not have the power to force Steve Wilson to make a statement. But the record shows that Steve Wilson did make a statement to the police investigator and that this information was made available to the Insurance Company. Moreover, if the Defendant felt unduly hampered by its inability to interrogate Mr. Wilson, it could have, as suggested in the Plaintiff's brief, filed a declaratory judgment action and advised the Plaintiff of why it was doing so and then proceeded to use the processes of the Court to force Mr. Wilson into depositions. It chose rather to issue its ultimatum thereby forcing the Plaintiff to institute an action to recover the money due her under the policy.[4] On this evidence, I find that the Plaintiff has made out a case for punitive damages.

■ In fixing the amount of punitive damages, several elements must be considered. Virginia recognizes that an award of punitive damages has a two-fold purpose. First, an award of punitive damages is primarily to punish the defendant for his willful disregard of plaintiff's rights and to deter others from engaging in similar conduct in the future. *F.B.C. Stores, Inc. v. Duncan, supra.* While many jurisdictions consider punishment as the only permissible purpose for awarding punitive damages, Virginia recognizes a secondary purpose. Virginia cases have stated that compensation for the loss sustained by the plaintiff may also be considered in fixing punitive damages. *Sperry Rand Corp. v. A–T–O, Inc.,* 459 F.2d 19 (4th Cir.), *cert. denied,* 409 U.S. 892, 93 S.Ct. 119, 34 L.Ed.2d 15 (1972); *Giant of Virginia v. Pigg, supra.*

As I pointed out before, the act of the Defendant in issuing its ultimatum was a raw exercise of its economic power in willful disregard to the Plaintiff's rights. Furthermore, the Plaintiff's evidence showed

that she had initially been informed by the Defendant that it would pay her living expenses during the repair of her house and had further lead her to believe that the cost of repairs would be paid which Defendant failed to do after making an initial advance of $1,500.00. The Defendant also knew it had to pay the cost of repairs because of the outstanding lien, and Mr. March so testified, but the Defendant did not make that payment. There is no question that the Plaintiff was in an economic bind during this period of time which caused her considerable stress. This aspect of her damages is in no way reflected in the compensatory damages that she is entitled to recover. Moreover, the Insurance Company as of December 31, 1981, had total assets of approximately $30,000,000.00 and a net worth of approximately $9.7 million. Considering these factors, I find that an award of punitive damages of $25,000.00 is appropriate. This award shall bear interest from the date of the Judgment Order at the rate of 9.29% per annum.

---

4. It is interesting to note that after the Plaintiff filed suit, Steve Wilson was deposed and did not resist the deposition by invoking his privilege against self-incrimination, but rather sought to answer all questions which were put to him. Whether he answered truthfully or not is not the point in issue. It's the fact that he did agree to answer questions which were put to him in the deposition.