## Richmond

W. B. Wright v. Harris W. Everett and Patricia A. Everett.

January 16, 1956.

Record No. 4442.

Present, All the Justices.

The opinion states the case.

*Miles Spence Bray, Harry L. Ryan, Jr.* and *Green, Trueax & Smoot,* for the plaintiff in error.

*Griffin T. Garnett, Jr.* and *Albert Balavage,* for the defendants in error.

Hudgins, C. J., delivered the opinion of the court.

Harris W. Everett and Patricia A. Everett, his wife, instituted this action against W. B. Wright, a real estate broker, claiming compensatory and punitive damages for his failure to exercise proper care in the management of their furnished home which they had authorized him to lease. The jury returned a verdict for plaintiffs in the sum of $325.17, compensatory damages, and $3,000.00, punitive damages, upon which the trial court entered judgment. This writ of error was awarded W. B. Wright, the defendant, to review that judgment.

The decisive question presented is whether the evidence is sufficient to sustain a verdict for exemplary or punitive damages.

The evidence from the plaintiffs' point of view may be summarized as follows:

Plaintiffs owned a furnished home in Arlington County, Virginia, that they desired to rent for four months while they were on a business trip to Nassau, Bahamas. On being assured by Leonard R. Honnold, an agent of W. B. Wright, that he always checked "the credit rating and references" of prospective tenants before leasing property entrusted to his care, they engaged him to lease the property for four months beginning December, 1952. Pursuant to this engagement and through the efforts of Honnold, the home as furnished was leased to Warden C. Stillwell and Joanne Stillwell, his wife, from December 5, 1952, to April 5, 1953, at a rental of $225.00 per month. At the time the Stillwells signed the lease Honnold required them to give him $150.00 as security for the payment of any breakage or damage to the house or furniture during their occupancy. In addition, Honnold agreed that he would have the accounts of all utilities, including water, electricity, gas and telephone, transferred from the names of the owners to the names of the lessees, and to collect the rent, deduct the broker's commissions and deposit the remainder in a local bank to the credit of Harris W. Everett.

While Honnold and Stillwell were inspecting the premises it developed that Stillwell and Everett had attended the same college. They became very friendly and later, before the lease was executed, the plaintiffs invited Stillwell to have dinner with them, at which

time Mrs. Everett told Stillwell that they would be glad to lease him the property. This fact was communicated to the agent, who thereupon prepared a lease, and on the night of December 5th took it to the Everetts' home. There he found that the plaintiffs had given their consent for the Stillwells to move and in fact Stillwell was actually moving some of his things into the home while plaintiffs were packing preparatory to leaving for Nassau. During this confusion Stillwell signed the lease and the plaintiffs were willing to sign, but at Honnold's suggestion they permitted him to retain the lease until he could obtain Mrs. Stillwell's signature. This was done and he mailed the lease to Nassau to be executed by plaintiffs.

Honnold, on being assured by Stillwell that he would promptly pay the accounts of all utilities, violated his agreement with plaintiffs and did not have the accounts transferred from the names of plaintiffs to those of the lessees. Consequently, all such bills were charged to plaintiffs, including a telephone bill for $424.95 incurred by the lessees.

On January 24, 1953, Mrs. Everett wrote Honnold that no part of the rent had been paid and suggested that thereafter checks for the rent be sent directly to her. She closed the letter with the statement that she expected to hear from the agent "on the next mail". The broker made no reply to this letter, but did continue his efforts to collect the rent from the lessees. The first check given for rent had been returned by the bank on which it was drawn marked "Insufficient Funds." The agent made several attempts to see Stillwell about the past due rent, but was informed that he was in Mexico. On January 14, 1953, the lessees gave him another check for two months' rent and past due utility bills. This check was likewise dishonored, although at the repeated request of the lessees it was redeposited for collection several times. The broker did not inform plaintiffs of his futile attempts to collect the rent until February 10, 1953, on which date he gave an account of his activities in the following letter:

"When we gave possession to Mr. Stillwell, he deposited with us $150.00 in cash and gave us a check for the first month's rental of $225.00. We deposited this check in the bank, but it was returned to us marked 'Insufficient funds'. We could not replace this check until around the middle of January for the reason that Mr. Stillwell travels and is out of the city a great portion of the time. When he did return, he gave us a check for $502.00, which was to pay for two

(2) months' rental and certain utility bills. When he gave us this check we returned the check that he had given us originally for the first month's rent. This check was issued payable to W. B. Wright on a California Bank and made by Kyril Ralston.

"We deposited this check and within a reasonable time it was returned to us with a notation 'Refer to Maker'. Mr. Honnold of our Virginia office contacted Mr. Ralston, the maker of the check, who instructed him to re-deposit the check, which we did. We had begun to get worried about this check and when it was deposited the second time we asked for a special report by telegram. When the report came back after depositing it the second time, the notation was 'Refer to Maker' and 'Unauthorized Signature.'

"We contacted Mrs. Stillwell who informed us that her husband was in Mexico City, Mexico, but that Mr. Ralston would take care of the matter. We contacted Mr. Ralston for the third time, who instructed us to again re-deposit the check. However, we demurred very strenuously on depositing this check the third time, as we had become very suspicious of this transaction. In the meanwhile, we received a telegram from Mr. Stillwell in Mexico City, a copy of which we are enclosing, and upon the instructions in the telegram we have again re-deposited this check.

"We do not want to worry you about this transaction but we think it better that you know the facts as they are transpiring. We have also contacted our attorneys for instructions, which we are following, regardless of the instructions from the tenant and Mr. Ralston. Also, we are trying to obtain information about them from the Credit Bureau of Washington, a mercantile agency which has offices all over the country.

"We will keep you informed as to what is taking place."

It will be noted that the broker in this letter did not inform his principal of the fact that the accounts of utilities had not been transferred from the names of the owners to the names of the lessees.

The plaintiffs did not reply to this letter until March 11, 1953, when Harris W. Everett wrote the broker expressing strong indignation at the failure of the Stillwells to pay the rent and offering to let them stay in the house until April 15, 1953, on the payment of $200.00 extra. He further stated that he did not know how the broker was handling the non-payment of rent, but would like to hear and that his part of all the collections for rent be deposited in the local bank and duplicate deposit slips be sent to him by air mail.

Under date of March 12, 1953, Mrs. Everett wrote the broker that she had received a letter from Mrs. Stillwell stating that she was taking good care of the house, furniture and garden. She thanked the broker for his letter of February 10th informing them of the situation. She authorized the broker to take such steps as he thought best to collect the rents and repeated that plaintiffs needed the money.

On March 18, 1953, a few days after receiving this letter, the broker caused a distress warrant to be issued, but before the sheriff could levy the warrant the Stillwells moved out leaving in the house only a combination radio, phonograph and television set, upon which the distress warrant was levied. However, this article seemed to be of little value. Thereafter, the broker caused all utilities except water to be disconnected.

On April 2, 1953, the broker wrote plaintiffs informing them of his inability to collect the rent and that the Stillwells had vacated the premises but had left the house in "immaculate condition". With the letter were enclosed bills for utilities amounting to several hundred dollars.

On April 14, 1953, the Everetts returned to Arlington and found the utilities disconnected. They were unable to spend the night at home as they had expected to do. On the next day, April 15, 1953, they had an interview with W. B. Wright and his agent, Honnold, during which time the Everetts were informed for the first time that the utility accounts had not been transferred to the names of the lessees and that accumulated utility bills totaled $681.41. W. B. Wright offered to pay and did pay a sufficient amount of the electric and gas bills to have them connected, but he declined to pay any part of the telephone bill. This action followed with the result above stated.

Defendant admitted in oral argument that he was liable to plaintiffs for compensatory damages, but denied that the facts in the case justified the court in submitting the question of punitive damages to the jury.

Plaintiffs' contention is thus stated in their brief: "The law in Virginia is clear that gross negligence or circumstance which add up to aggravation will properly found [sustain] an award of exemplary or punitive damages."

There are some expressions in the Virginia cases cited by plaintiffs which tend to support this contention, but in each case the evidence tended to prove that defendant had acted wantonly, oppressively,

with such malice or recklessness as implied a spirit of mischief or criminal indifference to his obligation. We have been cited no case and have found none in Virginia in which recovery of exemplary or punitive damages was allowed on proof of gross negligence without proof of one or more of the elements stated.

In *Franklin P. Farm* v. *Nash*, 118 Va. 98, 86 S. E. 836, the pertinent facts stated in the opinion were that F. F. Nash and F. P. Stras leased to Frank Brunton for five years a farm containing 98 acres. The lease provided that the lessee should pay an annual rent and all taxes; that he should not assign or sublet the premises without written permission of the lessors; that all improvements made on the property should remain thereon and pass to the lessors at the end of the term. The lessee was given an option to buy the property at any time within the five year period for the sum of $7,000 cash. While the lessors did not give written permission to sublet the property, they knew that the lessee had formed a corporation and were shown the plans whereby the corporation expected to expend $20,000 on improvements. They raised no objection and, indeed, sold some of the material to be used in the improvements. The rent was paid to January 1, 1914. On July 14, 1913, the lessors, over the protest of the officers of the corporation, took forcible possession of the premises and all improvements and leased the same to a third party at an increased rental. This evidence tended to prove that the defendants were actuated by a bad motive and that they, in a wilful, reckless, wanton disregard of plaintiff's rights, ousted it of lawful possession by force. In an action brought by the corporation for compensatory and punitive damages, the trial judge entered judgment on a verdict for defendants. On review this Court held that the question of punitive, as well as compensatory, damages should have been submitted to the jury. In the opinion this Court approved the following instruction which had been refused. (118 Va. 107):

"The jury are further instructed that should they believe from the evidence that the defendants committed the acts complained of in the declaration, and that said acts were committed wantonly and maliciously in order to illegally get possession of the premises described in the declaration, then the plaintiff is entitled to recover not only the determinable money loss which the evidence may show it sustained, but such exemplary and punitive damages as in their opinion are called for by the circumstances of the case, and the jury are instructed that punitive or exemplary damages are damages which

are allowed when one party has injured the other in a wanton, willful and oppressive manner in disregard of his rights, as a warning to him and other persons to prevent them from committing like offenses in the future."

The facts in the case of *Turk* v. *Martin*, 124 Va. 103, 97 S. E. 351, were that Turk, as a landlord, made an unlawful assault with a pistol upon Martin, his tenant. He struck him from the side, staggered him, and repeated the blows, and said that he did so to teach him a lesson. Upon this evidence tending to show a wilful, wanton and malicious disregard of plaintiff's rights, a recovery of exemplary or punitive damages was sustained.

A similar wilful, wanton and unlawful disregard of the rights of plaintiff was proven in the case of *Anchor Co., Inc.* v. *J. R. Adams, et al.*, 139 Va. 388, 124 S. E. 438. There a landlord unlawfully entered possession of the leased premises for the purpose of making extensive improvements, including the taking off of the roof, adding several stories to the building, and taking out partitions on the street floor, where the lessee was conducting a business. The construction of these improvements was done in such manner as to destroy the business of the tenant, who was in lawful possession of the premises. In affirming a recovery of exemplary or punitive damages this Court said: "That the wilful and unauthorized destruction of one's business is ground for the imposition of punitive damages on the wrongdoer has been settled in this State ever since the decision of *Peshine* v. *Shepperson*, . . . ", 17 Gratt. (58 Va.) 472, 94 Am. Dec. 468.

The theory upon which exemplary, punitive, or vindictive damages, sometimes called "smart money", are allowed is not so much as compensation for the plaintiff's loss as to warn others, and to punish the wrongdoer if he has acted wantonly, oppressively, recklessly, or with such malice as implies a spirit of mischief, or criminal indifference to civil obligations. *Peshine* v. *Shepperson, supra; Borland* v. *Barrett*, 76 Va. 128, 44 Am. Rep. 152; *Hogg* v. *Plant*, 145 Va. 175, 133 S. E. 759, 47 A. L. R. 308; *Weatherford* v. *Birchett*, 158 Va. 741, 164 S. E. 535; *Eshelman* v. *Rawalt*, 298 Ill. 192, 131 N. E. 675, 16 A. L. R. 1311; 15 Am. Jur., Damages, Sec. 266, p. 700.

In *Wood* v. *American National Bank*, 100 Va. 306, 40 S. E. 931, Judge Stafford G. Whittle, speaking for the Court, said:

"But there was no element either of malice, bad faith, oppression, or such willful negligence on its part proved as would have warranted the jury in imposing exemplary damages. On the contrary, while

the bank was not free from blame, its friendly relations and prior dealings with the plaintiff and prompt disclaimer of all intention to injure him, repel the imputation of malice or bad faith on their part in refusing to honor his check.

"Exemplary damages are allowable only where there is misconduct or malice, or such recklessness or negligence as evinces a *conscious* disregard of the rights of others. But where the act or omission complained of is free from fraud, malice, oppression, or other special motives of aggravation, damages by way of punishment cannot be awarded, and compensatory damages only are permissible. . . ."

Defendant contends that plaintiffs should have brought their action for breach of contract and not for a tort. The pleadings, that is, the motion for judgment and answer, are couched in language appropriate to a tort action and not to an action in assumpsit. However, even if defendant's contention on this point is sound, he did not raise the question in the lower court, but raised it for the first time in this court, too late to be considered. In addition, we have held that even though the foundation of the action arose out of privity of contract between the parties, if the same alleged facts show a breach of duty constituting a tortious neglect, plaintiff has a right to elect whether he will proceed in tort or assumpsit. *Ferrill* v. *Brewis' Adm'or*, 25 Gratt. (66 Va.) 765; *Spence* v. *Norfolk, etc., R. Co.*, 92 Va. 102, 22 S. E. 815; *W. W. V. Co., Inc.* v. *Black*, 113 Va. 728, 75 S. E. 82.

The general rule is that exemplary or punitive damages (with certain exceptions not here pertinent) are not allowed for breach of contract even though the action is *ex delicto* and not in assumpsit. Williston on Contracts, Vol. 5, Sec. 1338, p. 3762, and Sec. 1340, p. 3767; Restatement of the Law, Contracts, Sec. 341, p. 559, and Sec. 342, p. 561.

"As a general rule, damages for breach of contracts are limited to the pecuniary loss sustained. According to the overwhelming weight of authority, exemplary damages are not recoverable in actions for breach of contract, although there are dicta and intimations in some of the cases to the contrary. This rule does not obtain, however, in those exceptional cases where the breach amounts to an independent, wilful tort, in which event exemplary damages may be recovered under proper allegations of malice, wantonness, or oppression—as, for example, in actions for breach of marriage contracts." 15 Am. Jur., Damages, Sec. 273, pp. 708 and 709.

■ The evidence proves that the defendant did not make the proper credit investigation of the lessees before he caused the lease to be executed; that he did not have the utility accounts transferred as he promised to do; he did not keep plaintiffs fully informed as to the situation as he should have done. However, the evidence for plaintiffs is insufficient to prove any element of bad motive, or fraud, or that defendant acted in a manner so wanton or oppressive, or with such recklessness as implied a spirit of mischief or criminal indifference to the rights of plaintiffs. Therefore, defendant is liable to plaintiffs for compensatory damages only; i. e., compensation for all pecuniary loss and inconvenience which are the natural and proximate result of his failure to fulfill the obligations assumed by him as a real estate agent. Upon this state of facts the trial court committed reversible error in giving any instruction allowing recovery of exemplary or punitive damages.

The judgment is reversed, the verdict of the jury set aside, and the case remanded for a new trial on the question of the amount of compensatory damages.

*Reversed and remanded.*