### Richmond

## KAMLAR CORPORATION

### V.

## JESSE C. HALEY, JR.

January 21, 1983.

Record No. 801166.

Present: All the Justices.

*Murray H. Wright (McGuire, Woods & Battle,* on briefs), for appellant.

*Andrew J. Ellis, Jr. (M. Scott Hart; Mays, Valentine, Davenport & Moore,* on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

This case requires that we reexamine the availability of punitive damages to a party aggrieved by a breach of contract. Jesse C. Haley, Jr., brought an action against Kamlar Corporation for breach of a written five-year contract of employment. The motion for judgment also included counts alleging fraud, conspiracy, insulting words and libel against Kamlar and three of its individual employees. The tort counts were either nonsuited or struck by the trial court, except claims for libel and conspiracy against one of the co-defendants, Donald L. Arbogast. The jury returned verdicts in Haley's favor against Kamlar in the amount of $98,000 compensatory damages and $150,000 punitive damages on the breach of contract count. The jury returned a separate verdict assessing $10,000 general damages, but no punitive damages, against Arbogast on the tort counts. The judgment against Arbogast is final and is not before us.

We granted this appeal to Kamlar upon the questions whether the trial court erroneously permitted the jury to consider punitive damages for breach of a purely contractual duty and also erred in certain evidentiary rulings. Upon examining the record, we are satisfied that the evidentiary rulings complained of were within the trial court's discretion, which was not abused. We shall, accordingly, discuss only the question of punitive damages.

From 1968 until 1976, Haley was the manager and sole stockholder of Haley Excelsior, Inc., which owned and operated a plant producing excelsior, wood chips, and pine-bark mulch near Doswell, in Caroline County. The excelsior business dwindled in the early 1970's, and Haley sold the equipment related to that operation. In the mid-1970's, Haley made several approaches to Kamlar, a North Carolina firm engaged in the pine-bark mulch business, in an effort to sell the assets of Haley Excelsior, which was losing money.

In September 1976, the parties agreed on the terms of a sale whereby Kamlar would acquire the assets of Haley Excelsior for $150,000 cash, with a five-year contract of employment for Haley

at $20,000 per year, plus ten percent of the pre-tax profits of the Doswell operation. Haley was also to become a director of Kamlar and receive certain fringe benefits. He was to serve as manager of the Doswell plant, in effect continuing his former activities, but as Kamlar's employee. He was interested in the contract of employment because it would keep him gainfully occupied in the business he knew best until he reached retirement age.

The agreement was evidenced by three documents: a "Memorandum of Understanding" dated September 30, 1976, a "Bill of Sale," and an "Employment Agreement," both dated November 1, 1976. The "Memorandum" provides: "Buyer is to purchase certain assets from seller, a full and complete list of which is marked Exhibit A and is attached hereto and incorporated herein by reference." When the "Memorandum" was executed, "Exhibit A" did not exist. The parties were then uncertain as to the assets which were to be included in the sale. Several days later, a vice-president of Kamlar toured the Doswell plant with Haley and made up a handwritten inventory. This formed the basis of a typed inventory of articles sold, which was attached to the "Bill of Sale" marked "Schedule A."

The Doswell plant continued to lose money after the sale. Kamlar's officers had reservations as to Haley's management abilities before entering into the transaction with him, and they were not reassured by his performance as their manager.

In April 1977, Haley discovered a hydraulic pump, unused and still in its original shipping crate, buried under a pile of "junk" in the plant's time-clock room. He recognized it as one he had purchased long before the sale of the business to Kamlar. He had intended to use it to repair a piece of equipment, but had accomplished the repair without it. He had then decided to return the pump for credit, but had forgotten about it. He checked "Schedule A" attached to Kamlar's "Bill of Sale" and, finding no mention of the pump, concluded it was his. He caused it to be returned to the supplier and received a check in payment in the amount of $523.47, which he deposited to his personal account.

Donald L. Arbogast was assistant manager at the Doswell plant, having been hired by Haley in early 1977. On September 14, 1977, Haley and Arbogast had a "heated argument" over a matter unrelated to the pump. Later that day, Arbogast called Kamlar's vice-president in North Carolina, stating that Haley had been stealing corporate assets, that he could no longer work with

him, and that he wanted to resign. This resulted in a visit to Doswell by Kamlar's president, Albert Oettinger, the following day. Arbogast privately related to Oettinger a long list of complaints about Haley, including the alleged conversion of the hydraulic pump.

After discussing the matter by telephone with Kamlar's counsel, Oettinger prepared a typewritten affidavit including all of Arbogast's complaints, which Arbogast signed before a notary public. Oettinger then confronted Haley with Arbogast's affidavit. Haley denied its accusations but admitted selling the pump, contending that it was his property. He asked to be permitted to present the issue to Kamlar's board of directors, of which he was a member, and to abide by its determination as to the ownership of the pump. He offered to reimburse the corporation if the board determined that the pump had been included in the sale to Kamlar. Oettinger refused this request and asked Haley to sign a "confession" and a resignation. Haley refused. Oettinger promptly discharged him. Kamlar confirmed this action by a letter to Haley dated September 19, 1977, which stated that Haley was being terminated for the "unauthorized disposal of Corporate Assets" and the "illegal conversion and use of Corporate Funds." Arbogast, on several occasions, told people in the community that Haley had been fired for stealing company property.

Kamlar argues that the trial court, having sent the case to the jury only on a breach of contract theory, erred in granting Instructions 13 and 14, which submitted the question of punitive damages.[1] Haley points to the trial court's analysis of the evi-

---

[1] INSTRUCTION NO. 13. Punitive damages are something in addition to full compensation, not given as the plaintiff's due, but given rather with a view to the enormity of the offense to punish the defendant and thus make an example of him so that others may be deterred from committing similar offenses. Such damages are given where the wrongful act is done with a bad motive, or in a manner so wanton or reckless as to manifest a wilful disregard of the rights of others.

Therefore, if from the preponderance of the evidence the jury believe that the defendant Kamlar wrongfully discharged the plaintiff, Haley, and in so doing was actuated by malicious motives or a wantonness toward the said plaintiff, you may, in addition to compensatory damages, award, as punitive damages, such further sum as you may think right, in view of all the circumstances of the case; and in order to entitle the plaintiff to such punitive damages, actual malice need not be shown, if, from the preponderance of the evidence, you believe that the acts of defendant Kamlar were committed under such circumstances as to show a wilful disregard of the rights of the plaintiff, for, in all such cases, the law infers malice.

dence, in the light most favorable to Haley, in overruling Kamlar's post-trial motions:

> This case went to the jury as to Kamlar on the question of whether Kamlar breached its employment contract with the Plaintiff and, if so, whether that breach was committed maliciously or in wilful or reckless disregard of Haley's rights. There was abundant evidence to support both contentions. The evidence, taken in the light most favorable to Haley, showed that Kamlar's principal officers were dissatisfied with Haley's performance at the plant, that they accepted without question a document defamatory to Haley, that they failed even after requested to review the documents governing Kamlar's purchase from Haley, and that they denied Haley a chance to explain. This amply supports the inference that Kamlar's officers seized on the occasion of Arbogast's complaint as a pretext for getting rid of Haley.

We, too, must view the evidence in the light most favorable to Haley, and thus accept the premise that there was evidence to support a finding by the jury that Kamlar discharged Haley with an ulterior motive, in wilful disregard of his rights. The dispositive question, then, is whether a bad motive, underlying a breach of contract, in the absence of an independent, wilful tort, will support an award of punitive damages.

This question remained open for many years in Virginia. In *Wood* v. *Amer. Nat. Bank,* 100 Va. 306, 40 S.E. 931 (1902), a depositor sued his bank for negligently failing to honor his check. The action was brought *ex delicto,* although the court observed that the bank's relationship with the depositor was based on an implied promise. We stated that if a bank were to dishonor a check with "such a gross negligence, and such a disregard of the bank's duty and the plaintiff's rights, as might have warranted the jury in finding that it was acting *in bad faith and oppressively and tortiously*" [Emphasis added], punitive damages might be ap-

---

INSTRUCTION NO. 14. The Court instructs you that should you find your verdict against the defendant Kamlar for breach of a contract of employment with the plaintiff, you shall not, in assessing your verdict, consider punitive damages, unless you first find by a preponderance of the evidence that the defendant Kamlar acted in wilful or reckless disregard of the rights of the plaintiff as set forth in the contract of employment.

propriate. *Id.* at 312, 40 S.E. at 933. The facts of that case were found insufficient to support such an award.

In *Anchor Co.* v. *Adams,* 139 Va. 388, 124 S.E. 438 (1924), tenants sued a landlord for unlawfully entering the leased premises, tearing off the roof, rearranging partitions, and erecting scaffolding, thus destroying the lunchroom business conducted by the tenants. The landlord had contractual relationships with the tenants, by consenting to an assignment from a predecessor tenant and by agreeing to an extension of the predecessor's term. We affirmed an award of punitive damages for the wilful destruction of the plaintiff's business. The gravamen of the plaintiff's case was not limited to the landlord's breach of contract, but was based upon the landlord's independently tortious conduct. The award of punitive damages was approved upon the authority of *Peshine* v. *Shepperson,* 58 Va. (17 Gratt.) 472 (1867), which was an action *ex delicto* for destroying a business by the levy of an illegal attachment.

The question was settled by *Wright* v. *Everett,* 197 Va. 608, 90 S.E.2d 855 (1956). There, owners of a house sued a real estate broker for his failure to exercise proper care as their rental agent. The action was framed *ex delicto,* but this was immaterial because the plaintiff could have elected to sue either in tort or in contract. The relationship of the parties arose out of privity of contract, but the facts alleged showed both a breach of the contract terms and a tortious breach of duty. We held:

> The general rule is that exemplary or punitive damages (with certain exceptions not here pertinent) are not allowed for breach of contract even though the action is *ex delicto* and not in assumpsit. [Citations omitted].

> As a general rule, damages for breach of contracts are limited to the pecuniary loss sustained. According to the overwhelming weight of authority, exemplary damages are not recoverable in actions for breach of contract, although there are dicta and intimations in some of the cases to the contrary. This rule does not obtain, however, in those exceptional cases *where the breach amounts to an independent, wilful tort,* in which event exemplary damages may be recovered under proper allegations of malice, wantonness, or oppression . . . . [Emphasis added].

*Id.* at 615, 90 S.E.2d at 860. Even though the action was brought *ex delicto,* we found no evidence to support an award of punitive damages in that case.

 Damages are awarded in tort actions to compensate the plaintiff for all losses suffered by reason of the defendant's breach of some duty imposed by law to protect the broad interests of social policy. To further protect those interests, punitive damages may be awarded in a proper case, not as the plaintiff's due, but to punish the wrongdoer and to deter similar conduct. Damages for breach of contract, on the other hand, are subject to the overriding principle of compensation. They are within the contemplation and control of the parties in framing their agreement. They are limited to those losses which are reasonably foreseeable when the contract is made. These limitations have led to the "more or less inevitable efforts of lawyers to turn every breach of contract into a tort." [Footnote omitted]. W. Prosser, *Handbook of the Law of Torts* § 92 (4th Ed. 1971) at p. 614.

 The overwhelming weight of authority continues to resist this tendency. Most courts faced, as we are, with the question whether a simple breach of contract, accompanied by ulterior motives, in the absence of an independent tort, justifies an award of punitive damages, have answered the question in the negative. *See, e.g., Splitt* v. *Deltona Corp.,* 662 F.2d 1142, 1145 (5th Cir. 1981) (applying Florida law); *Kingsley* v. *Baker/Beech-Nut Corp.,* 546 F.2d 1136, 1142 (5th Cir. 1977) (applying Texas law); *Den* v. *Den,* 222 A.2d 647, 648 (D.C. App. 1966); *American International Land Corporation* v. *Hanna,* 323 So.2d 567, 569-70 (Fla. 1975); *Henry Morrison Flagler Museum* v. *Lee,* 268 So.2d 434, 437 (Fla. App. 1972); *Garrity* v. *Lyle Stuart, Inc.,* 40 N.Y.2d 354, 358, 386 N.Y.S.2d 831, 833, 353 N.E.2d 793, 795-96 (1976); *Success Motivation Institute, Inc.* v. *Jamieson Film Co.,* 473 S.W.2d 275, 282 (Tex. Civ. App. 1971); *Restatement (Second) of Contracts* § 355 (1979). Some jurisdictions permit punitive damages where the intent of the breaching party is "malicious," consisting of "an evil or rancorous motive influenced by hate; the purpose being to deliberately and wilfully injure the plaintiff." *See, e.g., Food Fair Stores, Inc.* v. *Hevey,* 275 Md. 50, 55, 338 A.2d 43, 46 (1975), but most jurisdictions have required that the plaintiff allege and prove facts amounting to an independent tort, before permitting the recovery of punitive damages.

We adhere to the rule of *Wright* v. *Everett* in requiring proof of an independent, wilful tort, beyond the mere breach of a duty imposed by contract, as a predicate for an award of punitive damages, regardless of the motives underlying the breach.

We returned to *Wright* v. *Everett* most recently in *Goodstein* v. *Weinberg*, 219 Va. 105, 245 S.E.2d 140 (1978), where we said:

> The general rule is that exemplary or punitive damages are not allowed for breach of contract even though the action is *ex delicto* and not *ex contractu*. This rule does not obtain, however in those exceptional cases where the breach amounts to an independent, willful tort since the plaintiff has a right to elect whether he will proceed in tort or upon the contract. [Citations omitted].

*Id.* at 109, 245 S.E.2d at 143. When *Goodstein* was tried, counts sounding in tort and contract could not be joined in a single pleading in Virginia. Such a misjoinder was bad on general demurrer, requiring the plaintiff to elect his remedy. This situation was changed by the adoption of Code § 8.01-272, effective October 1, 1977, which expressly permits such a joinder. (Haley here joined counts in tort and in contract against Kamlar, although the tort counts were withheld from the jury's consideration.) Since no election between tort and contract is now required, a plaintiff seeking punitive damages should allege a wilful, independent tort in a count separate from that which alleges a breach of contract. This serves to notify the defendant of the precise allegations he must meet at trial to resist that part of the claim which supports punitive damages. It also permits that aspect of the case to be tested separately from the rest, upon demurrer as to the sufficiency of the pleadings and upon a motion to strike as to the sufficiency of the proof.

The facts here, viewed in the light most favorable to Haley, show only a breach of contract inspired by an ulterior motive: Kamlar's officers, thinking Haley a poor manager, welcomed an opportunity to discharge him.[2] Instructions 13 and 14 permit-

[2] This may show a wilful desire to breach the contract to benefit Kamlar, but it falls short of showing a malicious desire to injure the plaintiff, which would be required even by those jurisdictions which permit punitive damages for contracts breached with malice. *Food Fair Stores, Inc., supra.*

ted the jury to award punitive damages to Haley if it found that Kamlar was "actuated by malicious motives" in breaching the contract of employment. They did not require proof of an independent, wilful tort as a predicate for such damages, nor did they spell out the elements of such a tort which the plaintiff would be required to prove. They could not do so, because no tort allegations remained in the case. Thus it was error to grant the instructions.

We find no error affecting the award of compensatory damages against Kamlar. That part of the judgment awarding punitive damages will be reversed and vacated for the reasons stated above. As thus modified, the judgment appealed from will be affirmed.

*Affirmed in part,*
*reversed in part*
*and final judgment.*

COMPTON, J., dissenting in part.

I would affirm the judgment for punitive damages.

Despite protestations to the contrary, the majority has not adhered to the rule of *Wright* v. *Everett,* 197 Va. 608, 90 S.E.2d 855 (1956). Rather, my brethren have altered the principle established in that case and, in the process, have stepped back from a sound, salutary precept relied on for over 25 years.

Until today the law of Virginia provided that, while punitive damages are not recoverable in breach of contract actions, the " 'rule does not obtain, however, in those exceptional cases where the breach *amounts to* an independent, wilful tort, in which event exemplary damages may be recovered under proper allegations of malice, wantonness, or oppression — as, for example, in actions for breach of marriage contracts.' " 197 Va. at 615, 90 S.E.2d at 860 (emphasis added). As Haley points out, this rule does not mean that the breach must actually *be* a tort; instead, it means the breach must "*amount*" to or be *analogous* to a tort.

The principles articulated by the late Chief Justice Hudgins in *Wright* v. *Everett* were not new to the law of this Commonwealth. For example, in *Anchor Co.* v. *Adams,* 139 Va. 388, 124 S.E. 438 (1924), cited in *Wright,* the plaintiff lessees sued their lessor for damages arising from breach of a restaurant lease contract. The

contract was "in writing, [its] meaning [was] clear, and the legal rights of the parties arising thereunder indisputable." 139 Va. at 390, 124 S.E. at 438. Notwithstanding the contract, the lessor commenced to make extensive improvements to the premises, erecting scaffolding in front of the property, thereby making access to the restaurant difficult, unpleasant, and dangerous. As a result, the plaintiffs were unable to continue their business. This Court held that the issue of punitive damages was properly submitted to the jury. Even though, as the majority points out, the plaintiffs' claim was based on the lessor's tortious conduct, the Court nevertheless stated:

> "That the wilful and unauthorized destruction of one's business is ground for the imposition of punitive damages on the wrongdoer has been settled in this State ever since the decision of *Peshine* v. *Shepperson* [58 Va. (17 Gratt.) 472 (1867)]. The undisputed facts in this case justify the imposition of such damages. The defendant, *in disregard of its contract,* made it impossible for its tenants to continue their business. So far as this record discloses, its action was without justification or excuse. No palliation of its conduct is suggested. *Those responsible therefor were apparently either ignorant of the plaintiffs' rights or else contemptuous of them.* If contemptuous, they apparently took a chance, relying upon their ability to convince a jury that the business was of small value. When such a chance is taken, the loser must expect the sanctity of contracts to be vindicated and all doubts to be resolved in favor of the plaintiff who suffers such a wrong." 139 Va. at 392-93, 124 S.E. at 439 (emphasis added).

*Wright* v. *Everett* has been interpreted by the federal courts applying Virginia law in just the fashion that I advocate. For example, in *Material Handling Industries, Inc.* v. *Eaton Corp.,* 391 F. Supp. 977 (E.D. Va. 1975), plaintiff sued defendant for breach of a franchise agreement in which plaintiff became an "authorized retail dealer" of equipment manufactured by defendant. Plaintiff alleged defendant maliciously and in bad faith terminated the agreement without complying with the notice provisions of the contract. Denying the defendant's motion to dismiss the punitive damage claim, the court said:

"It is indeed the general rule that punitive damages will not be awarded in an action for breach of contract. Virginia, however, approves the award of punitive damages in a contract action when the breach is occasioned by conduct of an aggravated manner or accompanied by malice, bad faith, or reckless disregard for the rights of others. *See* Wright v. Everett, 197 Va. 608, 615, 90 S.E.2d 855, 860 (1956). Since plaintiff has alleged that defendant maliciously and in bad faith terminated the franchise agreement to further anticompetitive and unlawful objectives, the Court concludes that plaintiff has alleged the requisite aggravated conduct which, if proved, would entitle plaintiff to punitive damages and will, consequently, deny defendant's motion to strike." 391 F. Supp. at 981-82.

In *United States* v. *Snepp,* 595 F.2d 926 (4th Cir. 1979), *aff'd in part, rev'd in part on other grounds,* 444 U.S. 507 (1980), a contract action by the United States against a former CIA agent for breach of a secrecy agreement, the court stated that punitive damages could be recovered "where the acts constituting the breach also constitute the commission of a tort or *are closely analogous thereto.*" 595 F.2d at 936 (emphasis added). Additionally, in *Matney* v. *First Protection Life Ins. Co.,* 73 F.R.D. 696 (W.D. Va. 1977), a suit on an insurance policy for failure to pay a claim, *Wright* v. *Everett* was construed by the court to "clearly reflect concurrence [of the Supreme Court of Virginia] with the general rule that punitive damages would be available where the breach of contract *amounted to* an independent willful tort, due to malicious, wanton or oppressive behavior by the breaching party." 73 F.R.D. at 697 (emphasis supplied).

Also, in *National Homes Corp.* v. *Lester Industries, Inc.,* 336 F. Supp. 644 (W.D. Va. 1972), in determining whether recovery of punitive damages for breach of contract was dischargeable by defendant's bankruptcy, Judge Widener said (before quoting the portion of *Wright* on which I rely), "[a]n examination of Virginia law makes it clear that a judgment such as the one here in question is permitted although the suit may sound principally in contract." 336 F. Supp. at 647. *See generally,* 5 A. Corbin, *Contracts* § 1077 at 438-40 (1964).

Yet, confronted with the explicit language of *Wright* v. *Everett,* and the interpretation placed on that language by other courts,

the majority now says that the rule of that case "require[s] proof of an independent, wilful tort, beyond the mere breach of a duty imposed by contract, as a predicate for an award of punitive damages, regardless of the motives underlying the breach." As I understand that holding, proof of conduct which merely "amounts to" a wilful tort without actually supporting an independent cause of action in tort will no longer suffice for recovery of punitive damages in a suit for breach of contract.

We are even advised by the majority that henceforth such a claim in tort should be pled in a count separate from that which alleges a breach of contract. This is a further indication, I submit, that no longer in Virginia will punitive damages be allowed in a pure contract action in which the proof shows conduct that evinces malice, wantonness, or oppression.

I lament the demise of the prior rule because it served the beneficial purpose of civilly punishing the wrongdoer in those exceptional cases based on a breach of contract where, as here, the conduct of the breaching party was egregious. As the trial judge noted, there was "abundant" evidence to support a conclusion that Kamlar's breach of contract was committed maliciously, and in wilful, reckless disregard of Haley's rights. Kamlar's principals were displeased with Haley's job performance. They accepted without question an employee's affidavit charging Haley with larceny of corporate property; they refused a request to review documents governing the sale of the business which bore on the alleged theft; they denied Haley an opportunity to explain; and they attempted to coerce Haley to sign a confession — Oettinger said to Haley: " 'If you sign this affidavit, nobody will know about this. . . . This thing could ruin your reputation here in the community. . . . If you sign this, nobody will know but you and I and the members of the corporation.' " From the facts, the jury properly could conclude that Kamlar knew that by terminating Haley on a pretext they were depriving him of his livelihood and probably damaging his reputation; that Kamlar's officers knew the pump was not on the list of items sold and, thus, belonged to Haley; that Kamlar did not investigate because the officers wanted to discharge him in violation of his employment contract because he was not generating sufficient business profits for the corporation; and that they attempted to blackmail Haley into resigning.

In sum, and viewing the evidence in the light most favorable to Haley, I think that Kamlar's conduct, while not fitting into a well-

defined tort category, was malicious, wanton, and oppressive. Thus, it "amounts to" a tort and should be deterred by an award of punitive damages.

STEPHENSON, J., joins in dissent.