23 F.3d 399
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 BENNETT AIR CONDITIONING, INCORPORATED, Plaintiff-Appellant,
v.
WARREN MANUFACTURING COMPANY, INCORPORATED, Defendant-Appellee,
and
AUTOMATIC EQUIPMENT SALES OF WASHINGTON, INCORPORATED, Defendant.
 No. 92-2318.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 9, 1994.
Decided April 26, 1994.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CA-92-376-A)
 Argued: Raymond Donald Battocchi, McLean, VA, for appellant.
 Dabney Jefferson Carr, IV, Mays & Valentine, Richmond, VA, for appellee.
 On Brief: John Lloyd Rice, Willard L. Boyd, Miller & Chevalier, Chartered, Washington, D.C., for appellant.
 Gary J. Spahn, Mays & Valentine, Richmond, VA, for appellee.
 E.D.Va.
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 Before WIDENER, WILKINSON, and MICHAEL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Heating and cooling system components manufactured by Appellee Warren Manufacturing Company, Inc. (Warren) were sold by Warren's distributor, Automatic Equipment Sales of Washington, Inc. (AES), to Appellant Bennett Air Conditioning, Inc. (Bennett). Bennett, alleging serious defects, sued Warren and AES for breaches of express and implied warranties. Bennett sought replacement and repair costs from both Warren and AES and settled with AES prior to trial.
 
 
 2
 A jury trial on Bennett's claims against Warren began on September 15, 1992. At the close of Bennett's two-day case, the district court granted Warren's motion for judgment as a matter of law on both the replacement and repair costs issues. Bennett then filed this appeal. We affirm the district court's ruling on replacement costs, but reverse and remand for a new trial on repair costs.
 
 I. Background
 
 3
 In 1987, Bennett was chosen as the mechanical subcontractor for a new office building project in Virginia called Enterprise One. (We refer to both the building and its owner, Enterprise One Limited Partnership, as Enterprise One.) Warren was very interested in supplying Bennett with variable air volume boxes (boxes) for the heating and cooling system at Enterprise One.[1] In early 1988, Warren demonstrated the boxes to Bennett representatives. Thereafter, on March 24, 1988, Warren's president, Roy Kelley, wrote to Bennett's president, Art Bennett, as follows:
 
 
 4
 Please be assured that Warren has a total corporate commitment to these products and will live up to all the associated obligations, including the correction of chronic or latent defects which might possibly occur....
 
 
 5
 JA 41. Art Bennett was not satisfied. He proposed on April 8, 1988, that Warren agree to the following:
 
 
 6
 [Warren] will, at its option, repair or replace [the boxes, should problems occur,] at no cost to [Bennett]. Should Warren elect repair and the results not be satisfactory to the building owner, they will pay all costs associated with the replacement of the boxes with those of another manufacturer.
 
 
 7
 JA 43 (emphasis added).
 
 
 8
 Warren would not accept Bennett's proposed language, and Kelley explained why at trial: Warren could not agree to guarantee the satisfaction of a building owner it did not know and who might be unreasonable. On April 11, 1988, Kelley responded to Bennett's proposal of April 8 and promised to pay the costs of replacing the boxes with those of another manufacturer if the boxes failed to comply with job requirements. Bennett still refused to buy the boxes. Kelley then wrote Bennett a letter on June 2, 1988, with the following promise:
 
 
 9
 In the event of chronic or inordinate problems with Warren VAV units used on your projects, Warren will either repair or replace said units at no cost to Bennett Air Conditioning, Inc. Should such replacement or repair not result in satisfactory operation, Warren will pay all costs associated with the replacement of the units with those of another manufacturer.
 
 
 10
 JA 49. Following this letter, Bennett agreed to buy 118 Warren boxes for $45,364.50.[2] Art Bennett said he would not have purchased the boxes without Warren's June 2, 1988, promise.
 
 
 11
 Bennett installed the boxes in Enterprise One under a subcontract with Nardi Construction, Inc. (Nardi) around October 1988. Nardi paid Bennett in full for completing the contract. Bennett then entered into annual service contracts with Enterprise One's lessee, Government Technology Services, Inc. (GTSI). While there is some dispute, it appears the service contracts did not cover the boxes. Bennett also gave Enterprise One a one-year warranty to cover all costs associated with the installed mechanical products.
 
 
 12
 As soon as Enterprise One opened, the boxes began to fail and malfunction. The problems were so serious that Warren's president, Kelley, visited the building. Warren performed continuous repairs throughout 1989, apparently to no avail. During four months in early 1990, the boxes' failure rate was estimated at 47 percent. Even Kelley acknowledged that a reasonable failure rate would be no higher than one to two percent. Serious problems with the boxes apparently continued up to the time of trial.
 
 
 13
 It is denied by Warren, but Bennett claims that Warren also agreed in December 1988(i) that Warren (with Bennett's help) would repair the boxes so they would operate to specifications by January 1989, and (ii) that, if Bennett thereafter experienced problems in more than five percent of the boxes, Warren would replace them as promised in the June 2, 1988, letter. In any event, Warren did not comply with several demands by Bennett to replace the boxes under the June 2 letter. Although Bennett has repeatedly demanded compliance with the June 2 letter, neither Enterprise One (the building owner) nor Nardi (the general contractor) has ever sought replacement of the boxes.
 
 
 14
 On March 16, 1992, Bennett filed a three-count complaint against Warren and AES alleging that the failure of the boxes resulted in breaches of implied warranties of fitness and merchantability and breach of express warranty. Bennett sought both repair and replacement costs. Bennett settled with AES before trial.
 
 
 15
 At trial, a Bennett expert testified it would cost over a quarter of a million dollars to replace the boxes with those of another manufacturer.
 
 
 16
 On repair costs, Bennett offered considerable proof on the damages it had suffered due to the allegedly defective boxes. In the four years following installation, Bennett employees visited Enterprise One over 200 times and attempted to repair over 300 failures on the Warren boxes. These failures were apparently in addition to those dealt with by Warren. Art Bennett testified, "I have had more problems with the Warren boxes than every other VAV job we have done combined for the last 20 years." JA 350. Each time Bennett personnel went to Enterprise One, they filled out a service ticket showing, inter alia, the hours spent and the work performed. No dollar charge was entered on the tickets at the time of the visits. In preparation for trial, Art Bennett directed a subordinate to calculate a dollar charge for each ticket based on the hours worked and the service rates in effect at the time. The service rates per hour were as follows:
 
 YearRate
 1988$44.00 1989-October1990$48.00
 November 1990-1991$54.00
 1992$58.00
 
 17
 The subordinate, however, made an error in his calculations and charged the service time on tickets from 1988 through October 1990 at $54.00 per hour. Art Bennett corrected this error in his trial testimony. In addition to the tickets themselves, Bennett submitted a summary exhibit listing each ticket for which recovery was sought and the dollar amount of its service charge. The total was $64,773.80.
 
 
 18
 The district court granted Warren's motion for judgment as a matter of law on the replacement costs issue. It concluded that Bennett did not have a legal obligation to Enterprise One or Nardi to replace the boxes. According to the court, Bennett did not prove that it had suffered or would suffer replacement cost damages. (Bennett had not replaced the boxes and no one had demanded replacement.) The district court also granted Warren's motion for judgment as a matter of law on the repair costs issue, concluding the repair costs proof was deficient for two reasons. First, the court said no distinction was made by Bennett between routine warranty work and non-routine service work on the defective boxes. Second, the court noted the hourly rate errors in some of the repair tickets.
 
 
 19
 Bennett asserts on appeal that (i) even absent actual damages, replacement costs are recoverable under Va.Code Ann. Sec. 8.2-719(1)(a), a section of the UCC as adopted by Virginia (UCC), and (ii) the evidence of repair costs was sufficiently certain to permit the jury to award damages. Warren responds, in part, that (i) replacement costs are not recoverable because Bennett has not incurred any replacement costs damages, and (ii) Bennett's evidence of repair costs was deficient as a matter of law.
 
 
 20
 We review the district court's grant of judgment as a matter of law de novo, Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 318 (4th Cir.), cert. denied, 113 S.Ct. 206 (1992), and examine whether "viewing the evidence in the light most favorable to the nonmoving party and giving [it] the benefit of all reasonable inferences, there is sufficient evidence in the record to support a jury verdict in [its] favor." Herold v. Hajoca Corp., 864 F.2d 317, 319 (4th Cir.1988), cert. denied, 490 U.S. 1107 (1989).
 
 II. Replacement Costs
 
 21
 In seeking replacement costs, Bennett relied on the unequivocal replacement promise in Warren's June 2, 1988, letter. In granting Warren's motion for judgment as a matter of law on this issue, the district court held:
 
 
 22
 And while I recognize that parties can agree to a particular remedy, in order to be able to prevail and to obtain that remedy you must show that there are damages to do so and that you have sustained the damages to do so. And I find that that has not been done in this case.
 
 
 23
 JA 478. Bennett argues the district court erred because the June 2 letter is enforceable under Sec. 8.2-719(1)(a) of the UCC, which allows parties to agree to any remedy, including one which requires no proof of actual damage. Warren responds that Bennett's position contradicts both the terms of the UCC and well-settled principles of contract law.
 
 
 24
 Section 8.2-719(a)(1) of the UCC provides in pertinent part:
 
 
 25
 Sec. 8.2-719. Contractual modification or limitation of remedy.--(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section[Sec. 8.2-718] on liquidation and limitation of damages,
 
 
 26
 (a) the agreement may provide for remedies in addition to or in substitution for those provided in this title and may limit or alter the measure of damages recoverable under this title....
 
 
 27
 (Emphasis added.)
 
 
 28
 The UCC also contains general provisions designed to aid in its construction and application. For instance, Sec. 8.1-106 provides in part:
 
 
 29
 Sec. 8.1-106. Remedies to be liberally administered.--(1) The remedies provided by this act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed ....
 
 
 30
 (Emphasis added.) This section restates the well-established principle that contract damages are recoverable only to the extent necessary to compensate the injured party for its losses resulting from the breach. Carey v. Piphus, 435 U.S. 247, 254-55 (1978) (" '[t]he cardinal principle of damages in Anglo-American law is that of compensation for the injury caused to plaintiff by defendant's breach of duty' ") (emphasis in original); Kamlar Corp. v. Haley, 299 S.E.2d 514, 517 (Va.1983) ("[d]amages for breach of contract ... are subject to the overriding principle of compensation"); Ronald A. Anderson, Anderson on the Uniform Commercial Code Sec. 1-106:9 (3d ed. 1981) ("UCC Sec. 1-106 merely restates the doctrine that damages are limited to just compensation for the loss sustained by reason of the breach .... In the absence of loss, no recovery may be had for the violation of any provision of the Code") (emphasis added).
 
 
 31
 Bennett was paid in full for installing the boxes. Title to the boxes has passed to Enterprise One, and Bennett has received the full benefit of its bargain as the mechanical subcontractor on the building project. Further, Bennett concedes that neither Enterprise One (the building owner) nor Nardi (the general contractor) has demanded or even suggested replacement of the boxes. Nor has Bennett replaced the boxes. The district court was therefore correct to conclude that Bennett suffered no actual damages as a result of Warren's breach of the replacement promise. As indicated above, Bennett nevertheless argues that Sec. 8.2-719(1)(a) allows parties to agree to any remedy they choose, including a remedy which requires no proof of actual damages. We need not reach this issue because Bennett's claim for replacement costs fails for another reason.
 
 
 32
 According to the Supreme Court of Virginia, "when the damages resulting from the breach are susceptible of definite measurement or when the agreed amount would be grossly in excess of actual damages, courts usually construe such an agreement[setting compensation for a breach] to be an unenforceable penalty." 301 Dahlgren Ltd. Partnership v. Board of Supervisors of King George County, 396 S.E.2d 651, 653 (Va.1990) (emphasis added).[3] In that case, Dahlgren applied for water and sewer service (availability and connection) and paid a deposit of $71,250 to the Board. After the Board said that Dahlgren could not sell or assign its rights, Dahlgren requested return of the entire deposit. The Board refused, citing a forfeiture provision in its ordinance which provided that an applicant who did not pay the balance due was only entitled to the return of one-half of the deposit. The court assumed the ordinance was part of the contract between Dahlgren and the Board, but found no evidence the Board had sustained damages as a result of Dahlgren's default in payment of the remainder of the fees. Accordingly, the court concluded the forfeiture provision was a penalty: "[T]he amount fixed is grossly in excess of, and out of all proportion to, actual damages." Id. at 653.
 
 
 33
 We believe that Dahlgren applies to the replacement costs issue in this case. Bennett says the June 2 letter agreement entitles it to over one quarter of a million dollars in replacement costs. Yet Bennett has not suffered any replacement costs damages. As in Dahlgren, the amount sought by Bennett on this claim is unreasonable "and out of all proportion" to its total lack of replacement costs damages. Id. at 653. Accordingly, we affirm the district court's grant of Warren's motion for judgment as a matter of law on the replacement costs issue.
 
 III. Repair Costs
 
 34
 The district court also granted Warren's motion for judgment as a matter of law on the repair costs issue. Bennett contends the evidence of repair costs (the service tickets, a summary of the tickets, and Art Bennett's testimony) was sufficient for the jury to have determined these costs with reasonable certainty. Warren argues that the district court was correct because the repair tickets contain too many errors and leave too many questions unanswered. On this issue, Bennett has the better argument.
 
 
 35
 It is well settled that "[d]amages must be proved with reasonable, but not absolute, certainty." Oden v. Salch, 379 S.E.2d 346, 352 (Va.1989). In Oden, the Supreme Court of Virginia said:
 
 
 36
 Because absolute certainty is often unattainable, it is proper to place before the jury "all the facts and circumstances of the case having any tendency to show damages, or their probable amount, so as to enable [the jury] to make the most intelligible and probable estimate which the nature of the case will admit."
 
 
 37
 Id. (citation omitted). Speculative and conjectural damages cannot be recovered. Miller v. Johnson, 343 S.E.2d 301, 307 (Va.1986). However, a plaintiff is "not required to prove with mathematical precision the exact amount of loss when the existence of damage is established and the facts and circumstances proven are such as to permit an intelligent and probable estimate of the amount of damages ... sustained." Gertler v. Bowling, 116 S.E.2d 268, 270 (Va.1960).
 
 
 38
 Warren asserts that Bennett's repair costs proof was lacking or deficient because Bennett's service tickets (a) do not adequately delineate the work performed (i.e., some tickets include work on equipment of other manufacturers, warranty work, routine maintenance, or start-up tasks unrelated to the defective boxes), (b) often reflect more than one dollar total or an erroneous total due to the use of an incorrect hourly rate, (c) use a service rate that does not reflect Bennett's actual costs, and (d) do not set forth rates for travel and overtime. We address each contention in turn.
 
 
 39
 (a)
 
 
 40
 Each service ticket provides spaces for the equipment serviced, the nature of the visit, and the services performed. These spaces were filled in by Bennett service personnel at the time the work was performed. Less than five percent of the tickets (approximately eleven out of 290) list work on "EQUIPMENT" other than the boxes. Such an insignificant error is hardly enough to entitle Warren to judgment as a matter of law.
 
 
 41
 Warren's contention that the tickets include a great deal of warranty and service agreement work for which it should not be charged is equally flawed. For instance, Warren contends Bennett's contract with Nardi includes an allocation for warranty service on the boxes. Warren argues that "[s]ince the tickets include all service calls made on the boxes, they include calls for warranty service, for which Nardi paid Bennett as part of the contract for installation." Resp. Br. at 7. Warren's argument is based on a "turnover sheet," a Bennett in-house document, which apparently had "plug" numbers on costs to perform categories of work, including warranty work, on Enterprise One. However, Art Bennett testified he anticipated that Bennett would have only about $6,000 in warranty work to perform for Nardi on the project. While Warren is entitled to present warranty work evidence to the jury in an effort to reduce Bennett's repair costs damages, the evidence does not entitle Warren to judgment as a matter of law.
 
 
 42
 As for service work under the contract with GTSI (the tenant), Art Bennett's testimony refutes Warren's argument:
 
 
 43
 Q Now, were these invoices or these amounts paid for by the tenant under any service agreement? A No, they were not.
 
 
 44
 Q Is work on the VAV boxes covered by your service agreements with GTSI?
 
 
 45
 A No, it is not.
 
 
 46
 Q How do you know that?
 
 
 47
 A I reviewed the agreements.
 
 
 48
 JA 346.
 
 
 49
 Warren's assertion that some of the tickets reflect routine work unrelated to the defects is essentially groundless. Some of the tickets do list the "SERVICES PERFORMED" in a more general fashion, such as "[s]erviced and repaired Warren V.A.V. boxes." See, e.g., JA 95. Numerous tickets, however, list detailed "SERVICES PERFORMED" on the boxes, including the inspection and repair of motor failures, controller malfunctions, stripped nuts, sticking dampers, and other problems. These represent most of the precise defects alleged by Bennett. Contrary to Warren's assertion, few tickets reflect routine maintenance or start-up tasks.
 
 
 50
 (b)
 
 
 51
 Warren next complains of multiple dollar totals on the tickets. As Warren asserts, many of the tickets do contain more than one dollar total for the work. However, Bennett placed not only the tickets into evidence, but also a five-page summary of the tickets on which it sought recovery. This summary contains three columns respectively labeled "DATE," "INVOICE" and "AMOUNT." The last heading contains only one amount for each ticket.
 
 
 52
 Warren also points to incorrect hourly rates that were used to calculate the amounts for tickets from late 1988 through October 1990. Art Bennett, however, corrected this error in his testimony and gave the jury the correct rates. Additionally, Bennett contends the tickets from November 1990 to 1992, which purportedly exceeded $17,000, were "accurate to the penny." Appellant's Br. at 18.
 
 
 53
 (c)
 
 
 54
 Warren says the service rates used to calculate the amounts on the tickets "do not reflect Bennett's actual cost." But Art Bennett testified as follows concerning actual costs:
 
 
 55
 Q Are your actual costs different from your service rates?
 
 
 56
 A Yes.
 
 
 57
 Q Approximately what is your actual cost for an hour spent at service that is reimbursed at $60?
 
 
 58
 A Approximately 90 percent of that.
 
 
 59
 JA 345. This testimony was sufficient to allow the jury to estimate Bennett's actual costs.[4]
 
 
 60
 (d)
 
 
 61
 Warren finally asserts there was no evidence of the appropriate rates for travel and overtime. The record demonstrates otherwise. It appears that travel time was charged at the same rate as regular time. For example, ticket 103922, dated June 26, 1992, lists 7.5 regular hours and .5 travel hours. The ticket charges all eight hours at $58 per hour (the rate then in effect) resulting in the total listed of $464. A random review of the tickets by the jury would have informed it that Bennett charged and sought the same amount for both regular time and travel time.
 
 
 62
 Evidence as to Bennett's overtime rate can also be gleaned from the record. The following testimony was adduced from Art Bennett on cross examination:
 
 
 63
 Q Why don't you take a look at the next page, 75115. How many hours are you charging on that sheet?
 
 
 64
 A Nine-and-a-half.
 
 
 65
 Q Okay. Eight straight time and one-and-a-half overtime?
 
 
 66
 A That is correct.
 
 
 67
 JA 359. The total listed on ticket 75115 is $553.50 and the hourly rate used was $54. The $553.50 figure can only be reconciled by charging eight "straight" hours at $432 (8 X $54) and 1.5 overtime hours at time and a half, or $121.50 (1.5 X $81). This was sufficient for the jury to find that Bennett's overtime rate was time and a half.
 
 
 68
 The theme running throughout Warren's arguments is that Bennett was required to prove every element of damages to the penny with absolute certainty. That is not required, although we would have much preferred to have seen a record in which Bennett made a sharper presentation of its case on repair costs. Indeed, some of Warren's arguments on the deficiencies of proof may have merit. Those arguments are for the jury, however, and do not entitle Warren to judgment as a matter of law. Viewing the evidence in the light most favorable to Bennett, and giving it the benefit of all reasonable inferences, there was sufficient evidence in the record to allow the jury to award repair costs with reasonable certainty. The jury should have been permitted to examine " 'all the facts and circumstances of the case having any tendency to show damages, or their probable amount.' " Oden, 379 S.E.2d at 352.[5]
 
 IV. Conclusion
 
 69
 For the foregoing reasons, we affirm the district court's award of judgment as a matter of law on the replacement costs issue, reverse its award of judgment as a matter of law on the repair costs issue, and remand the action for a new trial on repair costs.
 
 
 70
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 The boxes regulate air flow from a main air conditioning line to an area controlled by a thermostat, usually two or three rooms. Some boxes are also capable of heating air
 
 
 [2]
 Bennett had no contract of sale with Warren. Instead, AES, the distributor, bought the boxes from Warren and then resold them to Bennett
 
 
 [3]
 The UCC is supplemented by general principles of law to the extent those principles are not "displaced by [its] particular provisions." Va.Code Ann. Sec. 8.1-103
 
 
 [4]
 Since the issue is not before us, we take no position on whether Bennett is limited to recovery of only its actual costs, as opposed to its service rate
 
 
 [5]
 Warren also asserts there was no evidence that the rates Bennett charged were reasonable and customary. Warren cites no Virginia authority requiring such proof. Nevertheless, Art Bennett testified that he used his "current service rates" to calculate the amounts on the service tickets. JA 345. As noted above, Mr. Bennett also testified that Bennett's actual costs were approximately 90 percent of the current service rates. Viewing the evidence in the light most favorable to Bennett, we believe this testimony was sufficient for the jury to determine whether the rates charged were reasonable and customary
 We have considered Warren's remaining arguments and also conclude that they do not entitle Warren to judgment as a matter of law.