COURT OF APPEALS OF VIRGINIA

Present:   Judges Malveaux, Bernhard and Senior Judge Humphreys
Argued at Virginia Beach, Virginia


MULE-HIDE PRODUCTS CO., INC., ET AL.

v.      Record No. 1693-24-1

MIDLANTIC BUILDERS VA, LLC, ET AL.                    OPINION BY
                                                      JUDGE DAVID BERNHARD
                                                      JANUARY 6, 2026
MIDLANTIC BUILDERS VA, LLC, ET AL.

v.      Record No. 1825-24-1

MULE-HIDE PRODUCTS CO., INC., ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Johnny E. Morrison, Judge

Jonathan R. Mook; Chad E. Kurtz (Ogletree, Deakins, Nash, Smoak
& Stewart, P.C.; Cozen O'Connor, on briefs), for Mule-Hide
Products Co., Inc. and American Builders & Contractors Supply
Co., Inc.

George H. Bowles (Williams Mullen, on briefs), for Midlantic
Builders VA, LLC, CWB-Academy, LLC and MAC Churchland,
LLC.


These consolidated appeals arise from a contract for installation of a silicone coating product

on the roof of the Academy Crossing Shopping Center in Portsmouth, Virginia (the "Shopping

Center"). Midlantic Builders, VA, LLC, CWB-Academy, LLC, and MAC Churchland, LLC

(collectively referred to as "Midlantic") contracted with Subconsciously Precise Construction, LLC

("SPC") and Nigel Miles to coat the Shopping Center's roof with the silicone coating product sold

by Mule-Hide Products Co., Inc. ("Mule-Hide") and distributed by American Builders &

Contractors Supply Co., Inc. ("ABCS"). Midlantic alleged that Miles and employees of SPC,

Mule-Hide, and ABCS fraudulently induced Midlantic to enter into the contract by, in part, falsely stating Miles was trained and certified to install the coating product. After a six-day bench trial, the circuit court granted judgment in favor of Midlantic in the amount of $149,674.03 and later awarded $445,000 in attorney fees. On appeal, Midlantic challenges the damages award and Mule-Hide and ABCS challenge the circuit court's finding of reliance and the award of attorney fees.

This Court affirms the circuit court's finding of actual reliance, concluding that credible evidence supports its determination that Midlantic's principal withheld his final decision to hire Miles until after Mule-Hide's representative vouched for Miles's training. The documentary evidence cited by Mule-Hide and ABCS does not render that testimony inherently incredible or conclusively negate his subjective reliance.

This Court further holds that the circuit court erred in its damages analysis and in awarding attorney fees. The proportional "half-replacement-cost" methodology the court used to award $114,928 in benefit-of-the-bargain damages is not a recognized measure of fraud damages under Virginia law. Because the court awarded only legal damages and granted no equitable relief, it also lacked authority to award attorney fees, and that award must be reversed.

Accordingly, the judgment of the circuit court is affirmed in part, reversed in part, and remanded for recalculation of compensatory damages consistent with the guidance in this opinion.

BACKGROUND

In the early 2000s, Midlantic purchased the Shopping Center. Midlantic Builders VA, LLC, owned and managed by James Bickford, held an 80% interest in the property.[1] Bickford made all the management decisions for the Shopping Center, including those that would

---

[1] CWB-Academy, LLC, and MAC Churchland, LLC each maintained a 10% interest in the Shopping Center property.

contractually bind Midlantic. Roof leaks were present at the time of purchase, and tenants reported additional leaks over the years. Bickford fixed them as they arose.

In 2016, Bickford considered replacing the entire roof of the Shopping Center, which he deemed "obviously mature." The property retained the original roof, which by then was approximately 35 to 40 years old. Bickford testified he performed "[no] major work" on the roof, only repairs. Around the same time, Bickford planned to refinance the Shopping Center's loan before its expiration in 2017. He depended on the refinance proceeds to afford the roof renovations.

From August 2016 to March 2017, Bickford obtained at least eight roofing proposals. Four were for full roof-replacement, ranging from $212,475 (for only a section of the roof) to over $300,000, but he rejected these as too costly. Of the remaining silicone-coating proposals,[2] two came from a company named A Step in Time. Miles worked for A Step in Time during its inspection of the Shopping Center roof, though Bickford and Miles did not formally meet.[3] On February 3, 2017, Bickford called A Step in Time, admittedly, looking for Miles. He then called and spoke with Miles directly for five minutes. The record established that Bickford and Miles had several brief telephone conversations[4] leading up to Miles's March 17, 2017 email

---

[2] Silicone coating serves to extend the life of an aged roof by protecting it from certain elements, such as UV degradation and continued deterioration, and provides a cheaper option compared to wholesale roof replacement.

[3] The record established Miles was fired from A Step in Time; soon after, he launched his own (now-terminated) company, Subconsciously Precise Construction, LLC.

[4] Defendants' D-223 and D-224 exhibits represent a log of calls between Bickford and Miles leading up to the March 17, 2017 proposal. On February 27, 2017, Bickford called Miles, and the call lasted one minute. Miles called and spoke with Bickford the next day, February 28, 2017, for nearly four minutes. On March 12, 2017, Bickford conversed with Miles for about two minutes. On March 17, 2017, Bickford called Miles four times, with the calls lasting three minutes, one minute, one minute, and six minutes, respectively.

containing his proposal.[5]  The proposal provided Miles would "coat [the] roof with (mule hide) 50 yr. system plus coating."

On May 9, 2017, Bickford received a letter approving Midlantic's requested loan for the Shopping Center, with a stated purpose of creating a $215,000 repair maintenance reserve. According to the attached estimated closing statement, Bickford lowered the figure to $150,000. Later that day, Bickford called Miles to tell him the lender had approved the refinance; the call lasted about four minutes.

On May 16, 2017, Miles called the national representative of Mule-Hide products, Jim Lessig, to share Bickford had hired him.  Lessig described Miles as "[g]iddy, extremely happy, felt as though his business was going to take off."  As soon as the call ended, Miles sent a text message to ABCS representative Joey Gargaro.  Lessig also texted Gargaro: "Just spoke with Miles.  How about the shopping center?  Pretty exciting Ha."  Lessig added: "Looks like he's going to get a big church silicone job as well."  After these exchanges, Miles called and spoke with Bickford for three minutes.  Later that same day, Carol Aubuchon, the property manager of the Shopping Center, emailed Bickford about the water leaks and asked if he still planned to replace the roof "after [the] refinance [was] completed."  Bickford answered, "Yes.  We plan [to replace] the roof cover."

The refinance closing occurred on June 28, 2017.  The settlement statement allocated $100,000 to replacement reserves, which Bickford testified were for Miles's contract.[6]  Bickford

---

[5] Bickford maintained he did not see Miles's or SPC's proposal until the meeting at the Shopping Center on July 18, 2017.  Specifically, he indicated he did not know of the $100,000 contract price.

[6] In an August 2017 email to his attorney, Bickford confirmed the closing set aside exactly $100,000 to complete Miles's roof work.

On appeal, Mule-Hide and ABCS proffer an undated text message, stating, in part, "I obtained a loan amount of $100,000 to repair the roof, the amount of your contract," as evidence of Bickford's intent to hire Miles, but based on the context and circumstances surrounding the

- 4 -

called Miles for two minutes the night before the closing. On June 29, 2017, the lender deposited the $100,000 into Bickford's company account. Bickford acknowledged he and Miles had several conversations over the next two weeks to discuss the project. Specifically, Bickford called and spoke with Miles on July 7, July 8, and July 13. The calls lasted two minutes, one minute, and two minutes, respectively.

Bickford maintained he did not make any promises to Miles about giving him the Shopping Center job. He testified Miles "press[ed] [him] to make a decision or do something," but Bickford kept putting it off, saying, "Well, I'm still thinking on it, working on it, et cetera." Bickford further testified several days before the Shopping Center meeting, "[Miles] called [him] and said, 'I got some guys I'd like you to meet . . . and I think they can vouch for me and tell you what I've been able to do.'" Bickford stated he was unaware who was invited to attend the meeting and did no prior research on Miles before the meeting. Bickford asked Miles for referrals regarding his workmanship, to which he said A Step in Time; however, Bickford never contacted the company.

On July 14, 2017, Aubuchon emailed Bickford that the MoMac Brewing Company, a new tenant of the Shopping Center, was experiencing roof leaks. The next morning, Bickford called Miles, and they spoke twice, for two minutes and three minutes. Shortly after the second call, Bickford emailed Aubuchon: "I meet with the contractors Tuesday to sign the contract. They are prepared to start immediately. Will start on [MoMac's] space first."[7] At trial, Bickford testified that on July 15, 2017, he believed he was going to sign Miles's contract on July 18,

---

message, it appears Bickford was responding to Miles's request for additional money ($40,000) to finish the project. Thus, the text was likely sent after Bickford hired Miles to install the silicone coating.

[7] Aubuchon testified she understood Bickford's email to mean he had hired a contractor and would sign the contract on July 18, 2017.

2017.[8]  At a deposition, he conceded while he "didn't one hundred percent have a deal yet," he was "one hundred percent planning on signing the contract."  Bickford explained, "[O]ne hundred percent is kind of a fictitious number that just says I am committed to do this. . . .  I was committed to sign a contract with Mr. Miles, as long as anything I needed to know proved out to be acceptable."  He added, "When I say I'm a hundred percent planning to do something, it means I'm committed to do it.  It doesn't mean it will happen.  It doesn't happen until it happens."  Bickford also stated: "I was committed to Mr. Miles to do the work, but I had not signed the contract.  I sign a contract when I sign a contract, but I was committed, wasn't talking to anybody else.  That's correct."  Counsel for Mule-Hide and ABCS conceded Bickford stated he was "over ninety percent there, but . . . needed to get over the hump."

On July 17, 2017, Miles called Lessig with news that Bickford had asked Miles to move ahead with the job and get things started.  Lessig testified Miles asked him to attend the contract signing the next day to answer any questions Bickford might have about the job.  That night, Lessig texted Gargaro: "Good news brother, I'm on my way down to Portsmouth to meet Nigel to get the job started for the silicone on the [Shopping Center] we looked at a year ago.  Owner gave him the go."  Lessig testified he invited Gargaro to attend to sort out the payment arrangements.  Gargaro answered, "I'll be there."

_____

[8] Counsel asked whether Bickford would have signed the contract if the meeting included only him and Miles.  He answered:

> No, no.  That's not true.  That is not true.  I did not say I would sign it until I signed it.  I was there with him.  I'm planning to hire him.  I like him.  I think he was giving me a good price, all those things come up, but I don't know him very well.  I would have asked Mr. Miles at that point, tell me some more about—let me go look at some other jobs you've done.  Tell me some other things that, you know, to convince me to get over the line.  He knew I wasn't convinced, or he wouldn't even have called the meeting, so I wasn't convinced.  I was close to being convinced, but wasn't convinced.

The circuit court rejected Mule-Hide's argument that Lessig and Gargaro attended the meeting to answer questions because they thought the Shopping Center job was "already a done deal." The court stated, "Both Mr. Lessig and Mr. Gargaro knew Mr. Miles frequently made exaggerations. Further, there was no reason for Mr. Lessig and Mr. Gargaro to personally meet with Mr. Bickford." The court also found "it was routine behavior for Mr. Lessig to vouch for contractors to help them make a sale." The trial evidence established Lessig and Gargaro were willing to help Miles secure a roofing project at a church by verifying his credentials with the pastor and serving as a reference, respectively.

On July 18, 2017, Bickford went to the Shopping Center for the meeting with Miles. There, he met Lessig and Gargaro.[9] The meeting lasted approximately 15 minutes, during which Bickford asked questions about the Mule-Hide silicone coating product; Miles's experience and training to apply the product; and available warranties. The circuit court found, largely due to Lessig's admission, that he vouched for Miles's training and credentials and "assured Mr. Bickford that he had trained Mr. Miles to install [the] Mule-Hide silicone coating."[10] At the end of the meeting, Bickford signed Miles's contract.

Thereafter, Miles, on behalf of SPC, installed the silicone coating material on the Shopping Center roof. Miles's installation was defective and did not conform with Mule-Hide's specifications. Tenants complained of roof leaks that were much worse than they had previously experienced. From July 2018 through December 2019, Midlantic had paid $22,384 for repairs to

[9] The circuit court found immaterial the fact that Miles's then-girlfriend, Jade Andrews, possibly attended the meeting.

[10] Lessig testified that contrary to his deposition testimony, he recalled questions from Bickford about Miles's training and experience: "I do remember a question that came up about Miles having done other jobs in the Tidewater region, and I do remember a question about having—had I trained Miles before on how to do this type of work." Lessig testified, "I remember vouching for Miles and his boasting of all the good things that he's done with other roofing companies."

the roof through 46 separate invoices. Those repairs have not fixed the roof. At trial, Midlantic also proved that it paid SPC more than the agreed contract price, resulting in overpayments of $12,362.03 beyond the $100,000 contract amount.

On March 15, 2019, Midlantic filed a complaint claiming fraudulent inducement of a contract, based on actual fraud, against Mule-Hide, ABCS, SPC, and Miles.[11] Midlantic requested compensatory damages of at least $395,500.03, as well as punitive damages, court costs, and attorney fees. The six-day bench trial commenced on May 24, 2021, and ended June 15, 2021. Mule-Hide's and ABCS's expert witness, Derek Hodgin, testified that the silicone coating is used "primarily to supplement an existing roof that might have some age or some life expectancy issues." Hodgin also testified that, in his experience, "most contractors would indicate [the silicone coating extends the roof by] . . . three to five years." When asked how long a roof's life could be extended by the silicone coating, David Schick, Mule-Hide's Warranty Claims Director, stated, "could be five, could be ten, could be fifteen, could be twenty. It depends a lot on the condition of the existing roof system beneath it." Schick was then asked if the silicone coating could extend a roof's life by 50 years, to which he responded, "[c]ould be fifty." Midlantic's expert, Bruce Barnaby, corroborated the fact that the life span of silicone coating depends on whether one has "a good [roof] membrane underneath it."

At the close of Midlantic's case, Mule-Hide and ABCS moved to strike Midlantic's evidence. The circuit court denied the motion, which the defendants later renewed during closing argument. In its letter opinion of September 13, 2021, the circuit court delineated its reasons for granting judgment in favor of Midlantic.

---

[11] Miles and SPC made no appearances in this matter.

*I.  Reliance*

The circuit court found clear and convincing evidence Lessig made false representations when "vouching for Mr. Miles's credentials and training" at the Shopping Center meeting.  The court held Gargaro and Miles engaged in fraud by failing to correct Lessig's endorsements.  Respecting actual reliance, the court found credible Bickford's testimony that he believed the representations made by Lessig and Gargaro and that afterwards he was convinced he should sign the contract with Miles.  The court rejected Mule-Hide's and ABCS's argument that Bickford "'already decided' to enter into the contract before the Shopping Center [m]eeting" based on its findings that the representations on Miles's training and credentials were material and further stating, "[it] is indisputable that price was a material consideration in this contract, but it was not the only material consideration."  In short, the court credited Bickford's testimony that "he does not decide to sign a contract until he has signed the contract and that before the Shopping Center [m]eeting[,] he still needed assurances regarding Mr. Miles's workmanship before signing."

*II.  Damages*

The circuit court found under the contract that Midlantic bargained for a "competent [installation of] 1.5 gallons per square [foot] of Mule-Hide silicone on the Shopping Center roof per Mule-Hide's specifications."  The adhesion problems caused by Miles's defective installation of the coating system were deemed incurable without first removing the improperly installed system.  Expert testimony further revealed it would not be "worthwhile" to apply new coating over old improperly installed coating or to replace the coating given the risks of further damage to the roof.  Therefore, the court held the most viable solution was to replace the roof.  The court, however, reasoned,

> [D]oing so would be putting Plaintiffs in an even better position tha[n] they would have been in absent the fraud.  Testimony was

that the life of a new commercial roof is around 15 years to 20 years, and the silicone coating properly applied to the Shopping Center roof would have extended the life of that roof between five and ten years. Consequently, the appropriate amount of damages for Plaintiffs to receive their benefit on the bargain is half of the price to replace the roof.

The court held the ranges "reflected a fact finding based on the testimony of several witnesses." Consistent with the ranges referenced in Midlantic's opening statement, the circuit court found that the evidence did not support a single precise number for the expected life of a properly installed coating system. Instead, the court heard testimony establishing a *range*—from 3 to 5 years (Hodgin) to as many as 20 or 50 years under ideal circumstances (Schick)—with the coating's effectiveness dependent on the quality of the existing roof membrane. Based on the credibility determinations, the court selected the 5-to-10-year range as supported by the record. The court compared that range against the 15-to-20-year expected life span of a new commercial roof, concluding that a full replacement award would improperly create a betterment. The circuit court thus rejected as a measure of damages what it found would be the cost to fully replace the roof, $229,856.[12] Instead, the court awarded a contractual damages component of $114,928 based on the value of the expected lifespan of the current roof had the Mule-Hide product been installed correctly. In a January 19, 2022 order, the court granted judgment in favor of Midlantic in the amount of $149,674.03, denied Midlantic's claim for punitive damages, and deferred ruling on Midlantic's request for court costs and attorney fees. As pertinent to this appeal, the court's compensatory damages award comprised three components: (1) $114,928 based on half the estimated cost to replace the roof, (2) $22,384 in repair costs for post-installation leaks, and (3) $12,362.03 in overpayments to SPC above the $100,000 contract price. On January 9, 2023,

---

[12] The circuit court noted an expert for Mule-Hide testified that the price of replacing the roof was $195,000. The court, however, afforded Midlantic favorable treatment regarding the price of the roof replacement in part because of "Mule-Hide's misleading advertising."

the circuit court entered an order awarding attorney fees in the amount of $445,000 against Mule-Hide and ABCS.  These cross-appeals followed.

ANALYSIS

*I.  The Circuit Court's Finding of Reliance*

Mule-Hide and ABCS contend the circuit court was "'plainly wrong' in finding clear and convincing evidence that [Bickford] relied on [Lessig's] misrepresentations" about Miles's training and credentials.[13]  They assert testimony and documentary evidence prove Bickford "already decided" to sign Miles's contract prior to the July 18, 2017 meeting, thereby defeating his testimony, which the court found credible, that "he does not decide to sign a contract until he has signed the contract and that . . . he still needed assurances regarding Mr. Miles's workmanship before signing."  Based on the pleadings, this Court must determine only whether there is sufficient evidence to overcome deference to the court's factual findings of actual reliance.

Code § 8.01-680 provides a "judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it."  "When judges sit as factfinders, 'no less than jurors,' we give their determinations 'the highest degree of appellate deference.'"  *Moncrieffe v. Deno*, 76 Va. App. 488, 496 (2023) (quoting *Palmer v. R.A. Yancey Lumber Corp.*, 294 Va. 140, 158 (2017)).  Thus, this Court will uphold factual findings as long as they are supported by credible evidence, even if conflicting

---

[13] Under Virginia law, a plaintiff claiming fraudulent inducement must prove six elements by clear and convincing evidence: (1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reliance by the party misled; and (6) resulting damage to the party misled.  *Evaluation Rsch. Corp. v. Alequin*, 247 Va. 143, 148 (1994).  "Where there are mixed questions of fact and law, '[this Court] give[s] deference to the trial court's factual findings and view[s] the facts in the light most favorable to the prevailing party, but . . . review[s] the trial court's application of the law to those facts de novo.'"  *Davis v. Davis*, 298 Va. 157, 167 (2019) (quoting *Tuttle v. Webb*, 284 Va. 319, 324 (2012)).

evidence exists. This Court "also presume[s]—even in the absence of specific factual findings—that the trial court resolved all factual ambiguities or inconsistencies in the evidence in favor of the prevailing party and gave that party the benefit of all reasonably debatable inferences from the evidence." *Hill v. Commonwealth*, 297 Va. 804, 808 (2019). "In assessing whether the evidence supported the trial court's decision, 'our appellate review "is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling."'" *Moncrieffe*, 76 Va. App. at 496 (quoting *Minh Duy Du v. Commonwealth*, 292 Va. 555, 566 (2016)).

Factual findings receive significant deference because the circuit court observed the witnesses' demeanor, inflection, and body language, factors that cannot be captured in a written record. *See Dennis v. Commonwealth*, 297 Va. 104, 126 (2019). "[I]ssues of witness credibility may be disturbed on appeal only when we find that the witness'[s] testimony was 'inherently incredible, or *so contrary to human experience as to render it unworthy of belief*.'" *Brown v. Commonwealth*, 75 Va. App. 388, 413 (2022) (emphasis added) (quoting *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable [persons] ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable [persons] should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

The reliance element in this case focuses on Bickford's subjective mental state. The circuit court, as factfinder, credited Bickford's testimony that despite taking numerous preparatory actions, he did not make his final decision to hire Miles until after hearing Lessig vouch for Miles's credentials at the July 18, 2017 meeting. This credibility determination is entitled to substantial deference on appellate review. Thus, Mule-Hide's and ABCS's argument

rests primarily on a determination that Bickford's testimony is inherently incredible. This Court cannot make that finding for two reasons.

First, the testimony is not "so manifestly false that reasonable [persons] ought not to believe it." *Id.* (quoting *Juniper*, 271 Va. at 415). Renovations to the Shopping Center roof represented a significant investment. Between August 2016 and March 2017, Bickford received no less than eight roofing proposals, rejecting most as too costly. Miles's $100,000 silicone-coating proposal was the lowest-cost option, making it attractive, but it raised questions about whether Miles possessed the expertise to properly perform the work. Bickford declared he was "committed to Mr. Miles to do the work," but was not yet "convinced." Bickford testified he dodged Miles's attempts to provide a clear answer regarding his proposal, and consequently, Miles called him, stating, "I got some guys I'd like you to meet . . . and I think they can vouch for me and tell you what I've been able to do." During the meeting, Bickford asked specifically about Miles's previous jobs and training to apply the silicone coating. Lessig and Gargaro accompanied Miles to the meeting, and Lessig admitted hearing such questions and "vouching for Miles." These contemporaneous actions support Bickford's testimony that he had not yet decided to sign the contract and that he relied on such assurances.

Mule-Hide and ABCS point to objective evidence suggesting Bickford decided to hire Miles before the meeting, including the calls between Bickford and Miles leading up to Miles's proposal and the loan refinance, the refinance amount structured for Miles's contract, Miles's May 16 statement to Lessig he had been hired, and Bickford's July 15, 2017 email announcing the contract signing. But viewing the evidence in the light most favorable to Midlantic, the prevailing party, the court's view amounts to a reasonable inference that Bickford obtained financing and made preliminary arrangements while still requiring additional information before

committing to execute the contract. Bickford's testimony is not so manifestly false, and thus, the credibility determination is sound on this ground.

Second, Bickford's testimony was not "shown to be false by objects or things as to the existence and meaning of which reasonable [persons] should not differ." *Gerald*, 295 Va. at 487 (quoting *Juniper*, 271 Va. at 415). Plainly, the evidence relied upon does not *conclusively* negate reliance. For example, the refinance created a reserve fund earmarked for roof work, but obtaining financing does not irrevocably commit a party to a specific contractor. Additionally, Miles's belief that he had been hired, Lessig's statements to Gargaro that Bickford "gave him the go," and Aubuchon's trial testimony about the Bickford email reflect their subjective understanding, not Bickford's final decision. Bickford's July 15 email announcing a meeting to "sign the contract" indicates his intent to proceed, but it does not establish he made an irrevocable final decision or that no further assurances were needed before executing the contract. Contrary to Mule-Hide's and ABCS's summation of the trial evidence, its existence and meaning produce different reasonable interpretations about Bickford's subjective mental state, including the court's view that he had not decided to sign the contract before the meeting and had relied on Lessig's representations concerning Miles's credentials and training.

Mule-Hide's and ABCS's argument, taken to its logical conclusion, would require this Court to establish a bright-line rule determining what quantum of documentary evidence is necessary to override a trial court's credibility determination regarding witness testimony. Such an undertaking would be inconsistent with Virginia's well-established standard of review. The circuit court's role as factfinder includes weighing all evidence, both testimonial and documentary, and making credibility determinations based on its observation of witness demeanor and assessment of the entire record. Requiring appellate courts to draw lines regarding the sufficiency of documentary evidence needed to render testimony inherently

- 14 -

incredible would improperly substitute this Court's judgment for that of the trial court and would undermine the deferential "plainly wrong" standard mandated by Code § 8.01-680. The question is not whether documentary evidence exists that could support a different conclusion, but whether the trial court's credibility determination, in light of all the evidence, is so manifestly false that reasonable persons ought not to believe it.

This Court finds that the circuit court's factual findings of actual reliance are neither plainly wrong nor devoid of credible evidence supporting them. Although certain trial evidence exists which the court did not expressly discuss, its presence does not render Bickford's testimony inherently incredible. Thus, the court's factual findings are proper. Mule-Hide and ABCS did not challenge any other elements of the fraudulent inducement action. Consequently, the judgment in favor of Midlantic must be upheld, and the Court next considers the circuit court's awards of compensatory damages and attorney fees.

## II. The Calculation of Compensatory Damages[14]

While Midlantic may recover compensatory damages for fraudulent inducement, the issue is whether the circuit court employed a measure of damages recognized under Virginia law

---

[14] In their opposition to Midlantic's motion to reconsider the damages award, Mule-Hide and ABCS asserted no evidence supported the 5-to-10-year range and the court appeared to have drawn that range from their opening statement. Mule-Hide and ABCS accordingly argued it was error for the circuit court to award half the cost of a new roof. Mule-Hide and ABCS asserted the circuit court should have instead relied on the 3-to-5-year range and awarded only 20% of the cost of a new roof. On appeal, in contrast, Mule-Hide and ABCS argue sufficient evidence supported the 5-to-10-year range and ask that, if the circuit court's finding of fraud is not vacated, this Court affirm the circuit court's compensatory damages.

Midlantic asserts under the approbate-reprobate doctrine, Mule-Hide and ABCS are bound to their trial position in opposition to the motion to reconsider and cannot argue differently on appeal. Midlantic misunderstands the approbate-reprobate doctrine. It is true that "[a] party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory. Nor may a party invite error and then attempt to take advantage of the situation created by his own wrong." *Cangiano v. LSH Bldg. Co.*, 271 Va. 171, 181 (2006); *see also Rowe v. Commonwealth*, 277 Va. 495, 502 (2009). When a party moves the trial court to adopt a particular action and the trial court does so, that party cannot then argue on appeal the trial court erred. When, however, the

- 15 -

and supported by the record. "Generally, 'damages for breach of contracts are limited to the pecuniary loss sustained.'" *Nestler v. Scarabelli*, 77 Va. App. 440, 463 (2023) (quoting *Dunn Constr. Co. v. Cloney*, 278 Va. 260, 266 (2009)). In contrast, "tort damages are intended to compensate a 'plaintiff for all losses suffered by . . . the defendant's breach of some duty imposed by law to protect the broad interests of social policy.'" *Id.* at 464 (alteration in original) (quoting *Kamlar Corp. v. Haley*, 224 Va. 699, 706 (1983)). Importantly, "contract and tort damages may, and often do, overlap," and "awarding compensatory damages in tort actions—is not precluded."[15] *Id.* As emphasized in *Dominion Resources, Inc. v. Alstom Power, Inc.*, 297 Va. 262, 270 (2019), "[d]amages in both tort and contract . . . exist only to compensate a plaintiff for the injury suffered, not to leave that plaintiff better off because of the injury." This principle prevents betterment—placing the defrauded party in a better position than they would have occupied had the fraud not occurred.

In this case, the court found the adhesion problems with Miles's installation were incurable without first removing the improperly installed system. Based on expert testimony, the court held that applying new coating over old improperly installed coating and replacing the defective coating were not good options given the risks of further damage to the roof. The circuit court thus found that the most viable solution for Miles's defective installation was full roof replacement at a cost of $229,856. The court held, however, that awarding the full cost would put Midlantic "in an even better position than they would have been in absent the fraud."

---

trial court does not adopt a litigant's position, that party is generally not precluded from agreeing with the trial court's ruling on appeal. Further, invited error is not here in issue. Rather, the circuit court rejected Mule-Hide and ABCS's position on damages, and thus, Mule-Hide and ABCS are not precluded from now agreeing with the circuit court's ruling.

[15] "Contract damages 'are subject to the overriding principle of compensation. They are within the contemplation and control of the parties in framing their agreement . . . [and] are limited to those losses which are reasonably foreseeable when the contract is made.'" *Nestler*, 77 Va. App. at 464 (alterations in original) (quoting *Kamlar Corp.*, 224 Va. at 706).

In fraud cases, the amount of recoverable damages is governed by settled principles. "There is no damage where the position of the complaining party is no worse than it would be had the alleged fraud not been committed," *Klaiber v. Freemason Assocs.*, 266 Va. 478, 485 (2003) (quoting *Cmty. Bank v. Wright*, 221 Va. 172, 175 (1980)), and "[t]he usual remedy in an action for fraud is to restore the defrauded party to the position he held prior to the fraud," *Murray v. Hadid*, 238 Va. 722, 731 (1989). "[R]ecipients of fraudulent misrepresentation may recover 'the pecuniary loss to [them] of which the misrepresentation is a legal cause, including (a) the difference between the value of what [they have] received . . . and its purchase price . . . and (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.'" *Nestler*, 77 Va. App. at 464 (fourth and fifth alterations in original) (emphasis omitted) (quoting Restatement (Second) of Torts § 549 (1977)).

The circuit court, seeking to avoid betterment, awarded $114,928—half the estimated full replacement cost—based on its view that a properly applied silicone-coating system would have extended the life of the existing roof by 5 to 10 years, whereas a new roof would last 15 to 20 years. Thus, the court divided the $229,856 full replacement figure by two and treated that quotient as Midlantic's "benefit of the bargain." Although the court's concern with avoiding betterment was appropriate, this proportional replacement-cost method does not comport with the measure of fraud damages recognized in Virginia. The Supreme Court of Virginia has "not permitted this measure of damages in a fraud case," recognizing that "the replacement cost rule could permit a landowner to recover compensation which far exceeds the value of the real property." *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 91 (1999). Although the circuit court in this case attempted to avoid that problem by awarding only half the replacement cost, the resulting calculation remained tethered to replacement cost rather than to proven property values,

and therefore does not satisfy the reasonable-certainty requirement for benefit-of-the-bargain damages.

In its letter opinion of September 13, 2021, the circuit court, quoting *Hardy v. International Paper Realty*, 716 F.2d 1044, 1046 n.1 (4th Cir. 1983), stated two available formulas to measure compensatory damages in the case at bar:[16]

> [I]n cases of actual fraud where the plaintiff is not seeking recission on the contract, there are two kinds of compensatory damages: (1) the amount of damages to compensate for the injuries actually sustained that were naturally and proximately caused by the fraud and (2) the amount of damages to place the plaintiff in the same position he would have been in had the contract been performed where the false representation relied on by the plaintiff had turned out to be true.

The circuit court's application of these principles was informed by the condition and history of the Shopping Center roof, as well as Midlantic's choice of remedy.

The roof was 35 to 40 years old and had a long history of leaks before the coating was applied. Midlantic chose a coating system rather than full replacement precisely because it was less expensive. By the court's view on the evidence presented, the life expectancy of a properly installed silicone coating lasts significantly less than that of full roof replacement. Thus, awarding the full replacement cost would render Midlantic a significantly better outcome than that if the fraud had not taken place.

---

[16] The Supreme Court of Virginia has held that, "A victim of fraudulent inducement may rescind the contract or affirm the contract and sue for damages." *CGI Fed. Inc. v. FCi Fed., Inc.*, 295 Va. 506, 520 (2018) (citing *Wilson v. Hundley*, 96 Va. 96, 100-01 (1898)). "When a rescission occurs, 'the contract is terminated for all purposes, and the parties are restored to the status quo ante.'" *Id.* (quoting *McLeskey v. Ocean Park Invs., Ltd.*, 242 Va. 51, 54 (1991)). This reflects the traditional principle that a plaintiff cannot simultaneously undo the contract (through rescission) while also claiming the benefit-of-the-bargain or out-of-pocket damages based on the contract's existence. Here, Midlantic elected to affirm the contract and seek damages rather than rescind it; accordingly, the measure of damages is governed by Restatement § 549's out-of-pocket and consequential loss provisions, not by the rescissory remedy restoring the parties to the status quo ante.

The circuit court heard testimony regarding the poor condition of the roof, the expected lifespan of various roofing solutions, and the costs of different remediation options. Expert Hodgin testified that the silicone coating is "primarily to supplement an existing roof that might have some age or some life expectancy issues . . . [and] most contractors would indicate [the silicone coating extends the roof by] . . . three to five years."[17] Mule-Hide's Warranty Claims Director, Schick, declared that Mule-Hide's silicone coating systems could extend a roof's life by 5, 10, 15, 20, and even 50 years, depending "on the condition of the existing roof system beneath it."[18]

---

[17] Midlantic argues the circuit court found this testimony not credible, given Hodgin's "history of providing sham affidavits in roofing cases." The circuit court, however, did not explicitly find that the 3-to-5-year range testimony was incredible. Instead, the circuit court found that Hodgin's testimony "that not using cleaner may not have a big impact in this case" was not credible. In Virginia, "[i]t is well established that the trier of fact ascertains a witness'[s] credibility, determines the weight to be given to their testimony, and has discretion to accept or reject any of the witness'[s] testimony." *Sizov v. Sizov*, No. 1704-19-4, slip op. at 11, 2020 Va. App. LEXIS 299, at *16 (Dec. 8, 2020) (first alteration in original) (quoting *Layman v. Layman*, 62 Va. App. 134, 137 (2013)). "Furthermore, a trial court's resolution of conflicting expert testimony will only be reversed upon a showing of plain error." *Id.*, slip op. at 23, 2020 Va. App. LEXIS 299, at *35; *see also United Airlines, Inc. v. Hayes*, 58 Va. App. 220, 238 (2011) ("[T]he fact[-]finder may accept the parts of a witness'[s] testimony it finds believable and reject other parts as implausible."). The circuit court's selection of the 5-to-10-year range from among conflicting expert testimony, while within its discretion as factfinder, does not cure the legal error of using that range to calculate damages via a replacement-cost formula rather than through evidence of actual property values.

[18] Midlantic asserts the circuit court should have found that silicone coating extends a roof's life up to 50 years. Mule-Hide and ABCS assert Schick was mistaken in stating 50 years as an upper range and was apparently referencing the 50-year material warranty, which only guarantees that the silicone coating product itself, not the roof, will last for 50 years. It appears they could be correct, given Schick's later testimony that the 50-year material warranty "covers only that the silicone product itself should be free from manufacturing defect." Additionally, contrary to Midlantic's assertion, Bruce Barnaby testified that the 50-year material warranty does not guarantee that the roof will last for another 50 years but that the silicone coating itself will last 50 years. However, whether silicone coating in general could extend a roof's life by 50 years is of no consequence, because the circuit court's finding that the Shopping Center's roof would only have been extended by 5-10 years was supported by evidence, given that life extension depends on the condition of the roof prior to installation of the coating system, and the roof of the shopping center was in a poor condition prior to the installation of the coating system.

Expert Barnaby confirmed that the life span of silicone coating depends on whether the roof has "a good membrane underneath it."

The record does not establish the value of the roof had Miles properly installed the coating, nor does it establish the diminished value of the roof as installed. Faced with that evidentiary gap, the circuit court resorted to a roof-life ratio applied to the full replacement cost—a method not grounded in evidence of *actual* property values and not previously endorsed by the Supreme Court of Virginia. *See Bershader*, 258 Va. at 91 ("Generally, a person who acquired property by virtue of a commercial transaction and who has been defrauded by false representations is entitled to recover as damages the difference between the *actual value* of the property at the time the contract was made and the value that the property would have possessed had the representation been true." (emphasis added) (citing Restatement (Second) of Torts § 549 (1992))). A permissible measure of damages can be "the difference between the value of the item *bargained for* and the value of the item actually received," but this is only true when the plaintiff presents evidence of "actual value" with "reasonable certainty." *Patel v. Anand*, 264 Va. 81, 86-87 (2002) (emphasis added); Restatement (Second) of Torts, § 549(2). On this record, the "half-replacement-cost" calculation amounts to an approximation of what the existing roof might be worth had Miles adequately performed the installation of the silicone coating, rather than a reasonably certain measure of Midlantic's actual pecuniary loss.

The proper resolution on this record is to reverse the circuit court's compensatory damages award and remand for recalculation consistent with the applicable legal framework. While the circuit court correctly identified two formulas for measuring compensatory damages in fraud cases—out-of-pocket losses and benefit-of-the-bargain damages—it erred in applying a proportional replacement-cost methodology unsupported by evidence of actual property values.

On remand, the circuit court must determine compensatory damages using recognized measures under Virginia law, based on the evidence already adduced at trial. First, to the extent Midlantic seeks out-of-pocket recovery, it has to establish "the difference between the value of what [it] has received . . . and its purchase price." *Nestler*, 77 Va. App. at 464 (quoting Restatement (Second) of Torts § 549(1)(a)). This requires evidence of the actual value, if any, of the work SPC performed and the coating system as installed. If the evidence demonstrates that Miles's defective installation rendered the coating system worthless, Midlantic may recover the full purchase price paid to SPC, including any overpayments beyond the contract amount.

Second, Midlantic may recover consequential damages for "pecuniary loss suffered otherwise as a consequence of [its] reliance upon the misrepresentation." *Id.* (quoting Restatement (Second) of Torts § 549(1)(b)). The circuit court found that Midlantic incurred $22,384 in post-installation repair costs from July 2018 through December 2019 in an effort to address leaks caused by Miles's defective work. To the extent the record supports this finding, such expenditures constitute recoverable consequential losses directly flowing from Midlantic's reliance on the misrepresentations.

Alternatively, if Midlantic seeks benefit-of-the-bargain damages, the already adduced record must contain evidence establishing with reasonable certainty "the difference between the actual value of the property at the time the contract was made and the value that the property would have possessed had the representation[s] [by the defendants] been true." *Bershader*, 258 Va. at 91; *Patel*, 264 Va. at 86-87. This measure requires proof of (1) the actual current value of the Shopping Center roof with the defective coating system as installed, and (2) the value the roof would have had if Miles had properly installed the coating system as represented. The circuit court may not substitute a proportional replacement-cost formula for evidence of actual property values, as such

methodology does not satisfy the reasonable-certainty requirement and risks awarding damages untethered to proven pecuniary loss.

The circuit court must further ensure that any damages award avoids betterment, that is, the award must not place Midlantic in a better position than it would have occupied had the fraud not occurred. *Dominion Res., Inc.*, 297 Va. at 270. At the same time, the award must be grounded in evidence of actual pecuniary loss proven with reasonable certainty, not in approximations derived from lifespan ratios applied to replacement costs.

## III. The Attorney Fees Award

Virginia follows the American Rule, which holds that each party generally bears its own attorney fees absent a statute or contract providing otherwise. *Chacey v. Garvey*, 291 Va. 1, 8 (2015). The rule's "purpose is to avoid stifling legitimate litigation by the threat of the specter of burdensome expenses being imposed on an unsuccessful party." *Tonti v. Akbari*, 262 Va. 681, 685 (2001). "The authority for awarding costs and attorney[] fees is in derogation of common law, and therefore, subject to strict interpretation." *Chacey*, 291 Va. at 10. In *Prospect Development Company v. Bershader*, 258 Va. at 92, the Supreme Court of Virginia recognized a limited exception, holding that "in a fraud suit, *a chancellor*, in the exercise of his discretion, may award attorney[] fees to a defrauded party." (Emphasis added). The Court's prior precedent undergirds the equitable nature of this exception, noting that "[i]n the administration of remedies, an equity court is not bound by the strict rules of the common law, but adapts its relief and molds its decrees to satisfy the requirements of the case." *First Nat'l Exch. Bank v. Hughson*, 194 Va. 736, 753 (1953).

Virginia courts have consistently interpreted *Bershader* attorney fees as being available, in the court's discretion, only when equitable relief is granted.[19] In *Devine v. Buki*, 289 Va. 162, 178 (2015), the Court affirmed an attorney fees award because of the circuit court's grant of equitable relief in the form of rescission. In *St. John v. Thompson*, 299 Va. 431, 435 (2021), the Supreme Court clarified that *Bershader* "fees are proper if the trial court, exercising its discretion in a fraud case, *awards equitable relief*, and further determines that the circumstances surrounding the fraudulent acts and the nature of the relief granted compel an award of attorney[] fees." (Emphasis added). *St. John* explained the historical foundation for the equitable award of attorney fees:

> [R]ecovery of attorney[] fees in chancery court differed from recovery of attorney[] fees in common law courts. "Early English courts of equity allowed the Chancellor to award attorney[] fees to the prevailing party; the Chancellor, however, rarely granted fee awards unless the losing party acted in an abusive manner." In contrast, "[a]t common law, fee awards were based solely on statutes."

*Id.* at 434 (fifth alteration in original) (quoting John F. Vargo, *The American Rule on Attorney Fee Allocation: The Injured Person's Access to Justice*, 42 Am. U. L. Rev. 1567, 1570 (1993)).

The *Bershader* case is an "outgrowth from these . . . equitable roots." *Id.* at 435.

---

[19] Several Virginia circuit courts have held that equitable relief is a prerequisite to the award of *Bershader* fees. In *Oswald v. Holtzman*, 90 Va. Cir. 9, 11 (Fairfax 2015), the court held that,

> There is nothing in either the circuit court's opinion in *Bershader* or that of the Virginia Supreme Court to support Plaintiffs' claim here that attorney[] fees may be awarded whenever fraud is proven, regardless of whether the equitable powers of the court are invoked. In fact, both the circuit court and the Supreme Court made clear that the award of attorney[] fees was directly linked to the equitable nature of the relief granted.

Similarly, in *Sherman v. Southern Grading, Inc.*, 96 Va. Cir. 262, 263 (Chesapeake 2017), the court denied *Bershader* fees because the claims were solely for "actions at law."

Here, the circuit court erred in allowing attorney fees, as Midlantic did not request or receive equitable relief. The circuit court awarded Midlantic $149,674.03 in compensatory damages consisting entirely of legal remedies it deemed applicable: $114,928 for the value of what was contractually undertaken but not delivered in roof lifespan, $22,384 for prior roof repairs, and $12,362.03 for contract overpayments. The court declined to award punitive damages. Midlantic did not request equitable relief in its complaint or at trial, and the circuit court did not grant any form of equitable relief such as rescission, restitution, constructive trust, or injunctive relief. Nevertheless, the circuit court awarded $445,000 in attorney fees, finding that Midlantic was eligible to recover fees under *Bershader* even without equitable relief.

*St. John*, 299 Va. at 435, reiterated that attorney fees under *Bershader* are available only when the trial court "awards equitable relief." Compensatory damages for breach of contract or tort are legal remedies, not equitable relief. The circuit court's interpretation that every defrauded plaintiff is potentially eligible to recover attorney fees directly contradicts the Supreme Court's holding in *St. John* that such fees are proper only when the circuit court awards an equitable remedy.[20] *Id.*

The principle underlying *Bershader* attorney fees is the longstanding maxim that "*equity will not suffer a wrong to be without a remedy.*" *Price v. Hawkins*, 247 Va. 32, 37 (1994) (emphasis added) (citing *Drummond v. Rowe*, 155 Va. 725, 730-31 (1931)). The same is not true of actions at law that do not involve equitable relief. The fact Midlantic incurred attorney fees

---

[20] Prior to *Devine v. Buki*, 289 Va. at 178, and *St. John v. Thompson*, 299 Va. at 435, there was some question in Virginia law regarding whether *Bershader* fees could be extended beyond equitable relief. As the *Bershader* Court noted, albeit in an equitable relief setting, but for the award of attorney fees, the prevailing party's "victory would have been hollow" because of the amount that had to be expended to secure the remedy. *Bershader*, 258 Va. at 93. This reasoning suggested that the "hollow victory" justification for the imposition of fees might be argued for legal claims. The Supreme Court's 2021 decision in *St. John* resolved that question by clearly holding that equitable relief is a prerequisite to an award of attorney fees under *Bershader*.

exceeding their compensatory damages does not, by itself, absent statutory or contractual authorization, permit this Court to uphold the circuit court's award of attorney fees as a matter of fairness—an equitable consideration.

The circuit court's award in this case, entered in January 2023 after *St. John* was decided, cannot be reconciled with the Supreme Court's directive. Without an award of equitable relief, the circuit court lacked authority under *Bershader* to award attorney fees, regardless of the circumstances surrounding the fraudulent acts or the nature of the legal damages awarded. Accordingly, the circuit court, while clearly trying to do what it determined was fair under the circumstances, nevertheless erred in awarding attorney fees.[21]

CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment as to liability and its findings on reliance. We reverse the compensatory damages award because it was based on an improper proportional replacement-cost methodology not recognized under Virginia law. We reverse the award of attorney fees because the circuit court granted only legal relief, not equitable relief, and therefore lacked authority to award such fees. The case is remanded for recalculation of compensatory damages consistent with the legal framework set forth in this opinion and for entry of a revised final judgment omitting any award of attorney fees.[22]

*Affirmed in part, reversed in part, and remanded.*

---

[21] Because this Court reverses the attorney fees award based on the absence of equitable relief, this Court need not reach Mule-Hide's and ABCS's challenges to the circuit court's application of the *Bershader* factors.

[22] On remand, the circuit court is not restricted by this opinion from awarding pre- and post-judgment interest.